George William WOLDT, Defendant–
Appellant,

v.

The PEOPLE of the State of Colorado,
Plaintiff–Appellee.

Francisco Martinez, Jr., Defendant–
Appellant.

v.

The People of the State of Colorado,
Plaintiff–Appellee.

Nos. 97SA193, 97SA392.

Supreme Court of Colorado,
En Banc.

Feb. 24, 2003.

David S. Kaplan, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Katherine Brien, Deputy State Public Defender, Denver, Colorado, Attorneys for Defendant–Appellant George William Woldt.

Ken Salazar, Attorney General, Paul Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Plaintiff–Appellee.

Burke & Neuwirth, P.C., Dean Neuwirth, Denver, Colorado, Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, Benezra & Culver, LLC, Seth Benezra, Lakewood, Colorado, Attorneys for Defendant–Appellant Francisco Martinez.

Ken Salazar, Attorney General, Mary A. Malatesta, First Assistant Attorney General, Criminal Justice Section, Capital Crimes Unit, Paul Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Plaintiff–Appellee.

David S. Kaplan, State Public Defender, Kathleen A. Lord, Chief Appellate Deputy, Andrew C. Heher, Deputy State Public Defender, Denver, Colorado, Attorneys for Amicus Curiae the Colorado State Public Defender.

Ann Aber, Denver, Colorado, Michael J. Heher, Captain Cook, HI, Attorneys for Amicus Curiae the Colorado Criminal Defense Bar.

Justice HOBBS delivered the Opinion of the Court.

George W. Woldt and Francisco Martinez, Jr. separately appeal judgments of two three-judge panels sentencing them to death. For purposes of this opinion, we have combined these appeals. Woldt and Martinez allege that Colorado's three-judge death penalty sentencing statute, under which they were sentenced to death, is unconstitutional on its face under *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

The General Assembly adopted the three-judge panel sentencing system by statutory amendment in 1995, relying on a prior decision of the United States Supreme Court, *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which allowed a judge to sentence a defendant to death in a capital case. We have upheld death sentences under the prior statute, which assigned both the guilt and penalty phases to the jury. *See People v. Dunlap,* 975 P.2d 723, 765 (Colo.1999); *People v. Harlan,* 8 P.3d 448, 483 (Colo.2000). The defendants in those cases committed their crimes prior to the effective date of the 1995 amendment.

By means of its 1995 legislation, the Colorado General Assembly amended Colorado's death penalty statute to substitute a three-judge panel in place of the jury for the penalty phase of the trial in a capital case; the General Assembly left the guilt phase of the trial with the jury. *See* Ch. 244, sec. 1, § 16–11–103, 1995 Colo. Sess. Laws 1290–93. What the sponsors and proponents did not anticipate in 1995 was that they were relying on an opinion of the U.S. Supreme Court which would be overturned some twelve years after issuance.

In *Ring,* the U.S. Supreme Court reversed *Walton* "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty," and held that the Arizona judge-based capital sentencing scheme was unconstitutional. *Ring,* 122 S.Ct. at 2443.

In its *Ring* opinion, the U.S. Supreme Court singled out Colorado as one of four states with a death penalty statute of the same type as the Arizona statute that it was holding to be unconstitutional: "[o]ther than Arizona, only four States commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges." *Id.* at 2442 n. 6. Justice O'Connor explained in her dissent that "[t]he Court effectively declares five States' capital sentencing schemes un-

constitutional ... (identifying Colorado, Idaho, Montana, and Nebraska as having sentencing schemes like Arizona's)." *Id.* at 2449 (O'Connor, J., dissenting).

In a special session of the Colorado General Assembly, called by the Governor in 2002 following issuance of *Ring*, the General Assembly essentially readopted the provisions of the statute we applied in *Dunlap* and *Harlan*, again making the jury responsible for both the guilt and penalty phases of the trial in a capital case. *See* Ch. 1, sec. 1, § 16–11–103, 2002 Colo. Sess. Laws, Third Extraordinary Session 1–15.

We declare Colorado's three-judge capital sentencing statute, under which Woldt and Martinez received the death penalty, to be unconstitutional on its face under *Ring*. The three-judge capital sentencing statute required the judges to make factual findings as a prerequisite to imposition of the death penalty, in violation of defendants' Sixth Amendment right to have a jury make such findings.

We also conclude that Woldt and Martinez are entitled to be re-sentenced to life imprisonment without the possibility of parole. *See* § 18–1–105(4)(defining life imprisonment) & (5)(mandatory life imprisonment if the death penalty in this section is declared unconstitutional), 6 C.R.S. (2002) (recodified at section 18–1.3–401(4) & (5)). Section 18–1–105(5), 6 C.R.S. (2002), which was in effect during the existence of the three-judge panel sentencing provision and continues to be in effect today at section 18–1.3–401(5), 6 C.R.S. (2002),[1] states:

> *In the event the death penalty as provided for in this section is held to be unconstitutional by the Colorado supreme court or the United States supreme court, a person convicted of a crime punishable by death under the laws of this state shall be punished by life imprisonment.* In such circumstance, the court which previously sentenced a person to death shall cause such person to be brought before the court, and *the court shall sentence such person to life imprisonment.*

(emphasis added).

Although section 18–1.4–102(8) & (9), 6 C.R.S. (2002)—which the General Assembly enacted during the 2002 Third Extraordinary Session—provides us with discretion to affirm the death sentences in these cases or return these cases for a new capital sentencing proceeding, this time before a jury, we cannot lawfully exercise such discretion. To do so, we would have to (1) ignore the mandatory provision of section 18–1.3–401(5), 6 C.R.S. (2002), directing re-sentencing to life imprisonment without parole, in the event the death penalty statute is held unconstitutional; (2) make findings that judges cannot make under *Ring;* and (3) disregard principles of the ex post facto clauses of the United States and Colorado constitutions.

Accordingly, we hold that the three-judge panel capital sentencing statute, under which Woldt and Martinez were sentenced to death, is unconstitutional on its face under *Ring*. We further hold that Woldt and Martinez are entitled, under Colorado law, to re-sentencing by the trial court to life imprisonment without the possibility of parole.

We now proceed with our analysis.

## I.

### Facts and Procedural History

#### A.

#### George William Woldt

A jury convicted George Woldt of first-degree murder after deliberation,[2] felony murder,[3] and several other offenses[4] for the

---

1. We will cite to the current codification of section 18–1–105, 6 C.R.S. (2002), which is section 18–1.3–401, 6 C.R.S. (2002).

2. § 18–3–102(1)(a), 6 C.R.S. (1997).

3. § 18–3–102(1)(b), 6 C.R.S. (1997).

4. These offenses include: second-degree kidnapping of a victim of sexual assault, § 18–3–302(3)(a), 6 C.R.S. (1997); first-degree sexual assault with a finding that the defendant was physically aided or abetted by one or more other persons in the commission of the sexual assault, § 18–3–402(1)(a), (3)(a), 6 C.R.S. (1997); and conspiracy to commit first-degree murder, second-degree kidnapping, first-degree sexual assault, and second-degree assault, § 18–2–201(1), 6 C.R.S. (1997). Based on a separate but related incident, the jury also convicted Woldt of second-

kidnapping, rape, and murder of Jacine Gielinski.[5]

Following the jury verdict, a three-judge panel convened to determine whether Woldt should be sentenced to death or to life imprisonment without parole. The panel conducted a lengthy and thorough hearing, which included thirteen court days of testimony from nearly fifty fact, expert, and family witnesses.

Based on the evidence adduced at the hearing, the three-judge panel issued a sixty-two page sentencing order, setting forth its findings of fact and conclusions of law. Throughout the order, the panel emphasized that it engaged in independent fact-finding, and repeatedly stressed that it did not rely on the jury's factual determinations.

The panel engaged in the four-step process set forth in section 16–11–103, 6 C.R.S. (2000).[6] In the first step, the panel found that the prosecution proved five aggravating factors beyond a reasonable doubt, while failing to prove two others.[7] Woldt's panel found that Woldt "was actively, directly and personally involved in Ms. Gielinski's death," but the panel did not determine whether Woldt caused the fatal injuries to his victim.

Proceeding to the second step, the panel considered the mitigation evidence offered by the defendant, which included statutory and non-statutory mitigating factors. While Woldt presented a wide variety of mitigation evidence,[8] the sentencing order focuses on Woldt's claims that he was mentally ill at the time of the offense, specifically on his claims that he suffered from a brain lesion, obsessive/compulsive disorder, post-traumatic stress disorder, and dependent personality disorder.[9] The panel did not apply a particular burden of proof at this stage. Rather it simply noted that the mitigating factors exist and postponed consideration of the weight

degree assault with a deadly weapon, § 18–2–203(1)(b), 6 C.R.S. (1997); attempted second-degree kidnapping, § 18–2–101, 6 C.R.S. (1997); and conspiracy to commit second-degree assault, § 18–2–201(1), 6 C.R.S. (1997) (which merged with his other conspiracy conviction).

5. A separate jury convicted Lucas Salmon of first-degree murder and other offenses for his participation in the same crime. However, a three-judge panel sentenced Salmon to life in prison rather than death.

6. Martinez was sentenced in 1999, and Woldt was sentenced in 2000. No pertinent change in the statute occurred between 1999 and 2000; thus, we cite to the 2000 statutes.

7. The panel found the following aggravators: (1) Woldt intentionally killed a person kidnapped; (2) Woldt was a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; (3) Woldt committed a class one, two, or three felony and, in the course of or in furtherance of such or in immediate flight therefrom, Woldt intentionally caused the death of a person other than one of the participants; (4) Woldt committed the offense in an especially heinous, cruel, or depraved manner; and (5) Woldt committed the class one felony for the purpose of avoiding or preventing a lawful arrest or prosecution. The three-judge panel rejected two other aggravators offered by the prosecution: (1) Woldt committed the offense while lying in wait or from ambush; and (2) In committing the offense, Woldt knowingly created a grave risk of death to another person in addition to the victim of the offense.

8. The panel considered the following mitigating factors offered by the defense: (1) Woldt's age at the time of the crime; (2) Woldt's participation in the murder of Ms. Gielinski was "relatively minor," though not so minor as to constitute a defense to prosecution; (3) Woldt could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause or create a grave risk of harm to another; (4) Woldt's lack of prior criminal convictions; (5) the extent of Woldt's cooperation with law enforcement; (6) Woldt would not be a continuing threat to society if sentenced to life in prison; (7) any other mitigation evidence which in the court's opinion bears on the question of mitigation, including: Woldt's remorse; Woldt's childhood abuse by parents; Woldt was a follower in the rape and murder, not a leader; Woldt's religious conversion in prison; inconsistent theories adopted in the prosecution of Woldt and his co-defendant; and Woldt's co-defendant was sentenced to life rather than death.

9. According to the sentencing order, Woldt claims that his mental health issues relate to several statutory mitigators, including (1) Woldt's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to law was significantly impaired, but not so impaired as to constitute a defense to prosecution; (2) Woldt was under unusual and substantial duress at the time of the crime, though not such duress as to constitute a defense to prosecution; (3) Woldt's emotional state at the time the crime was committed. The panel addressed these mitigators as a group.

and significance of each mitigating factor until step three.

Progressing to step three, the panel weighed the five proven aggravating factors against the mitigation evidence, making a "qualitative determination" of the weight and importance of each mitigating factor. In making these determinations, the panel noted that Woldt's mitigation evidence, including the mental illness evidence, was "nonpersuasive in nature." The panel concluded unanimously, beyond a reasonable doubt, that the mitigating factors did not weigh more heavily in the balance than the proven statutory aggravating factors.

Finally, the panel proceeded to step four, the determination of the appropriate sentence. At this phase, the panel considered all of the evidence in the case. In contrast to the *Martinez* hearing, the panel conducted a "proportionality review" in which it compared Woldt's case to the cases of other defendants in Colorado who received a death sentence. Based on all of the evidence, the panel found unanimously and beyond a reasonable doubt that Woldt should be sentenced to death.

## B.

### Francisco Martinez, Jr.

A jury convicted Francisco Martinez, Jr. of first-degree murder after deliberation,[10]

along with seven other offenses,[11] arising from the kidnapping, rape, and stabbing murder of fourteen-year-old Brandaline Duvall.[12]

After the jury verdict, a three-judge panel convened to determine whether Martinez should be sentenced to life in prison or death. The panel conducted a detailed, six-day sentencing hearing, during which it heard testimony from thirty-five witnesses, including eyewitnesses, expert witnesses, and family members.

Following the sentencing hearing, the three-judge panel issued a sixteen page sentencing order. In the order, the panel set forth its findings of fact and conclusions of law. The panel explained that it based the findings on a full review of the trial transcript, exhibits introduced at trial, evidence from the sentencing hearing, and arguments of counsel. It also considered the jury verdicts.

The panel's sentencing order follows the four-step sentencing procedure set forth in section 16–11–103, 6 C.R.S. (2000). In the first step, the panel found beyond a reasonable doubt that five statutory aggravators existed.[13] The panel also found beyond a reasonable doubt that the defendant personally executed the victim by inflicting twenty-eight stab wounds and throwing the victim down an embankment to die.[14]

10. § 18–3–102(1)(a), 6 C.R.S. (1997).

11. The jury also convicted Martinez of: second-degree kidnapping, § 18–3–302(3)(a), 6 C.R.S. (1997); first-degree sexual assault, § 18–3–402(1)(a), 6 C.R.S. (1997); sexual assault on a child, § 18–3–405(2)(a), 6 C.R.S. (1997); first-degree assault, § 18–3–202(1)(a), 6 C.R.S. (1997); conspiracy to commit murder in the first degree, § 18–3–102(1)(a), 6 C.R.S. (1997); conspiracy to commit second-degree kidnapping, § 18–3–302(3)(a), 6 C.R.S. (1997); and conspiracy to commit first-degree sexual assault, § 18–3–402(1)(a), 6 C.R.S. (1997).

12. The prosecution charged six other men for their participation in the rape and murder. Martinez is the only person sentenced to death for the murder. A separate three-judge panel sentenced Danny Martinez to life imprisonment, rather than death, for the murder of Ms. Duvall.

13. The panel found that the prosecution proved the following aggravators: (1) Martinez killed a person kidnapped or being held a hostage by

Martinez or anyone associated with him; (2) Martinez has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; (3) Martinez committed the offense in an especially heinous, cruel, and depraved manner; (4) Martinez committed the class one felony for the purpose of avoiding or preventing a lawful arrest or prosecution, including the intentional killing of a witness to a criminal offense; and (5) Martinez committed a class one, two, or three felony and in the course of, or in furtherance of such, or immediate flight therefrom, Martinez intentionally caused the death of a person other than one of the participants.

14. The court instructed the jury on a complicity theory, and the jury found Martinez guilty of first-degree murder on a general verdict form, without indicating whether it believed that he was the principal actor in the murder or a complicitor.

Next, during the second step, the panel considered eleven statutory mitigating factors [15] and any other mitigating evidence. The panel found that evidence supported only two, non-statutory mitigating factors: (1) Martinez endured a "difficult, disturbing, and unsettled childhood" and (2) Martinez suffers from emotional disorders. Specifically, the panel found that the evidence clearly supported a diagnosis of anti-social personality disorder, and that Martinez had arguably presented evidentiary support for diagnoses of bipolar disorder and post-traumatic stress disorder. Despite these findings, the panel found no causal connection between any emotional disorder and the crimes committed.

Proceeding to the third step, the panel found unanimously, beyond a reasonable doubt, that the aggravating factors outweighed the mitigating factors.

Finally, during the fourth step the panel engaged in an individualized consideration of the nature of the crime and the background, history, and character of the defendant, examining all aggravating and mitigating factors. The panel considered several non-statutory aggravators, finding that Martinez remained remorseless, had a history of violent and unlawful behavior, harbored violent thoughts, had no coping mechanisms to control aggressive impulses, was a continuing threat to others even while imprisoned, and rejected opportunities to improve his life. Considering the totality of the circumstances, the panel unanimously sentenced Martinez to death, noting that "[i]n nearly fifty years of collective judicial experience, this panel has never dealt with a more shocking display of conscienceless depravity than that of this defendant."

## II.

We hold that the three-judge panel capital sentencing statute, under which Woldt and Martinez were sentenced to death, is unconstitutional on its face under *Ring*. We further hold that Woldt and Martinez are entitled, under Colorado law, to re-sentencing in the trial court to life imprisonment without the possibility of parole.

### A.

### The *Ring* Decision

In *Ring v. Arizona,* the U.S. Supreme Court declared the Arizona death penalty sentencing statute unconstitutional because it required a judge to make factual findings as a prerequisite to the imposition of the death penalty. *Ring,* 122 S.Ct. at 2443. The court held that the Arizona statute violated the defendant's Sixth Amendment right to trial by jury. *Id.* In so holding, the court overruled an earlier decision, *Walton,* 497 U.S. at 639, 110 S.Ct. 3047, in which it upheld the same statute. *Ring,* 122 S.Ct. at 2443.

Under the Arizona statute, a defendant convicted of first-degree murder underwent a sentencing hearing conducted by a single judge. *Id.* at 2434. If the judge found at least one aggravating circumstance beyond a reasonable doubt, the defendant was eligible for the death penalty. *Id.* The statute directed the judge to impose a death sentence upon a finding that no mitigating circumstances are "sufficiently substantial to call for leniency." *Id.* at 2434–35.

The U.S. Supreme Court reviewed Arizona's death penalty sentencing statute in 1990 and held it constitutional, even though a judge, not a jury, made the prerequisite factual findings necessary for imposition of the

---

**15.** The panel considered and rejected the following statutory mitigating factors: (1) Martinez's age at the time of the crime; (2) Martinez's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired; (3) Martinez was under unusual and substantial duress; (4) Martinez was a principal in the offense which was committed by another but his participation was relatively minor; (5) Martinez could not have reasonably foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause or would create a grave risk of causing death to another person; (6) Martinez's emotional state at the time the crime was committed; (7) the absence of any significant prior conviction; (8) the extent of Martinez's cooperation with law enforcement officers or agencies and with the office of the district attorney; (9) the influence of drugs or alcohol; (10) Martinez's good faith, although mistaken, belief that circumstances existed which constituted a moral justification for his conduct; and (11) Martinez is not a continuing threat to society.

death penalty. *Walton*, 497 U.S. at 649, 110 S.Ct. 3047. In *Walton*, the Supreme Court reasoned that the Sixth Amendment right to trial by jury requires that a jury find each element of a crime, but the court allowed the judge to determine whether aggravating circumstances existed making a defendant eligible for the death penalty. *Id.* at 648–49, 110 S.Ct. 3047.

A decade later, the U.S. Supreme Court decided *Apprendi v. New Jersey*, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The court explained that the label which the legislature applies to the fact—sentencing factor or element—is irrelevant because inquiry properly focuses on effect, not form. *Id.* at 494, 120 S.Ct. 2348. Any fact which increases the maximum sentence is by nature within the jury's province to find. *Id.* at 490, 120 S.Ct. 2348.

In *Ring*, the U.S. Supreme Court recognized the incompatibility of *Apprendi* and *Walton*. *Ring*, 122 S.Ct. at 2443. It then reversed *Walton* "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id.*

Under Arizona law, the maximum penalty a defendant could receive based solely on the jury's verdict of first-degree felony murder was life imprisonment. *Id.* at 2436. A defendant was not eligible for the death penalty unless the judge found the existence of at least one aggravating circumstance. *Id.* at 2437. Under the Sixth Amendment, the U.S. Supreme Court held that only a jury could find an aggravating circumstance necessary to raise the maximum punishment from life to death; hence, the Arizona statute assigning this function to a judge was unconstitutional. *Id.* at 2443.

### B.

### Colorado's Death Penalty Statute

■ We conclude that Colorado's three-judge panel capital sentencing statute, under which Woldt and Martinez received death sentences, section 16–11–103, 6 C.R.S. (2000)—like the Arizona statute—assigns a fact-finding role to judges that belongs to the jury under the Sixth Amendment.[16]

### 1.

### Eligibility and Selection

■ U.S. Supreme Court constitutional jurisprudence divides death penalty decision-making into two stages, eligibility and selection. During the eligibility stage, a state must narrow the class of murderers on whom the trier of fact may impose death. *See, e.g., Dunlap*, 975 P.2d at 735. Generally, states employ one of two methods to determine which defendants are eligible for the death penalty, weighing and non-weighing. Under the United States Constitution, both methods must begin with the trier of fact convicting the defendant of murder.

■ Determination of eligibility is the first stage. During this stage, both methods require a finding of at least one aggravating circumstance during either the guilt or the penalty phase. *Id.* Once the trier of fact has completed the first stage, the process differs in weighing and non-weighing states. In a weighing state, the trier of fact must weigh the aggravating factors against all the mitigating evidence to determine if the defendant is eligible for death. *Id.* In a non-weighing state, the finding of one or more aggravating factors automatically makes the defendant eligible for death. *Id.* A standard of beyond a reasonable doubt applies to eligibility fact-finding. *Id.* at 739.

■ Selection of penalty is the second stage. During this stage, the trier of fact determines whether an eligible defendant should actually receive a death sentence. *Id.* at 735–36. Under both the weighing and

---

16. The death penalty sentencing statute in Colorado was amended in July 2002, after the *Ring* decision. *See* § 16–11–103, 6 C.R.S. (2002). We discuss new statutory provisions directed at defendants sentenced to death by a three-judge panel, section 18–1.4–102, 6 C.R.S. (2002), in Section II.D.

non-weighing systems, the selection determination requires the admission of all relevant evidence. *Id.* at 736. In a weighing state, the trier of fact may select the death penalty or a life sentence based on all relevant information about the individual defendant. *Id.* at 735. In a non-weighing state, no special significance is given to statutory aggravators or mitigators; all evidence is considered when deciding whether to impose the death penalty. *Id.* at 736.

2.

Colorado's Four Steps

Under the 1991 statute which preceded the 1995 amendment, the jury, upon convicting a defendant of first-degree murder, would hear penalty-related evidence.[17] Standing alone, the jury's guilty verdict would support only life imprisonment. In order to impose the death penalty, the jury had to engage in a four-step process and unanimously agree on the death penalty; otherwise, a life sentence without the possibility of parole would result. *See* § 18–1.3–401(4), 6 C.R.S. (2002).

17. *See* Ch. 6, sec. 1, § 16–11–801—802, 1991 Colo. Sess. Laws, Second Extraordinary Sess. 16–22. As recited in *People v. Dist. Court*, 834 P.2d 181, 185–87 (Colo.1992), the 1991 act essentially reenacted the "pre–1988" statute containing the four-step sentencing procedure we upheld in *People v. Tenneson*, 788 P.2d 786, 789 (Colo.1990).

18. This excerpt from the 1995 session laws demonstrates that the legislature merely substituted one decision-maker for another, while retaining Colorado's four-step process (the language in capital letters was added by the amendment and the language with strikethroughs was deleted):

> (2)(a) After hearing all the evidence and arguments of the prosecuting attorney and the defendant, the ~~jury shall deliberate and render a verdict~~ PANEL OF JUDGES SHALL UNANIMOUSLY DETERMINE WHETHER TO IMPOSE A SENTENCE OF DEATH based upon the following considerations:
> (I) Whether at least one aggravating factor has been proved as enumerated in subsection (5) of this section;
> (II) Whether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist; and
> (III) Based on the considerations in subparagraphs (I) and (II) of this paragraph (a), whether the defendant should be sentenced to death or life imprisonment.

Through the first three steps, Colorado's process resembles a weighing state. *Dunlap*, 975 P.2d at 736. "[T]he eligibility phase continues through step three, when the jury weighs mitigating evidence against statutory aggravators." *Id.* at 739. Colorado's fourth step requires the trier of fact to consider all relevant evidence, but it does not require the trier of fact to give special significance to statutory aggravators or mitigators. Therefore, step four resembles the selection stage of a non-weighing state. *Id.* at 736.

In 1995, the General Assembly amended the death penalty sentencing statute, section 16–11–103, 6 C.R.S. (2000), to assign the penalty phase of a capital trial to a three-judge panel. In doing so, the General Assembly explicitly relied on the continued viability of *Walton*. In altering Colorado's capital sentencing provisions, the General Assembly made no change to Colorado's four-step death penalty determination process; it simply substituted judges for the jury in the penalty phase of a capital trial.[18]

The primary sponsor of the 1995 amendment to Colorado's death penalty statute, Senator Ray Powers, explained that the

> (b)(I) In the event that no aggravating factors are found to exist as enumerated in subsection (5) of this section, the ~~jury shall render a verdict of life imprisonment, and the court~~ PANEL OF JUDGES shall sentence the defendant to life imprisonment.
> (II) The ~~jury shall not render a verdict of death~~ PANEL OF JUDGES SHALL NOT IMPOSE A DEATH SENTENCE unless it UNANIMOUSLY finds and specifies in writing that:
> (A) At least one aggravating factor has been proved; and
> (B) There are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved.
> (c) ~~In the event that the jury's verdict is to sentence to death, such verdict shall be unanimous and shall be binding upon the court unless the court determines, and sets forth in writing the basis and reasons for such determination, that the verdict of the jury is clearly erroneous as contrary to the weight of the evidence, in which case the court shall sentence the defendant to life imprisonment.~~ THE SENTENCE OF THE PANEL OF JUDGES, WHETHER TO DEATH OR TO LIFE IN PRISON, SHALL BE SUPPORTED BY SPECIFIC WRITTEN FINDINGS OF FACT BASED UPON THE CIRCUMSTANCES AS SET FORTH IN SUBSECTIONS (4) AND (5) OF THIS SECTION AND UPON THE RECORDS OF THE TRIAL AND THE SENTENCING HEARING.

Ch. 244, sec. 1, § 16–11–103(2)(a)(c), 1995 Colo. Sess. Laws 1292 (emphasis added).

three-judge panels were to use the same four-step process that the jury had been using to decide whether to impose the death penalty. Hearing on S.B. 95–54 before the Senate Judiciary Comm., 60th Gen. Assemb., First Reg. Sess. (Jan. 16, 1995) (testimony of Sen. Powers). The bill's drafters intentionally left the same process in place, intending to ensure the bill's constitutionality. The Chief Deputy Attorney General of Colorado, who helped draft the bill, explained:

> We've picked the best appellate and legal minds that we had on the prosecutors' side of the table to look at [the constitutionality of the bill] ... because if anybody, it's the district attorneys and the attorney general who don't want to take a chance that the bill will be unconstitutional. But we are confident that this will not be because we haven't changed the present system. *What we've changed is the decision-maker.*

Hearing on S.B. 95–54 before the House Judiciary Comm., 60th Gen. Assemb., First Reg. Sess. (Mar. 2, 1995) (testimony of Steve ErkenBrack)(emphasis added).

Consistent with the opinion of bill sponsors and proponents that Colorado's four-step process was constitutional, we subsequently upheld jury-imposed death penalties employing this process. *See Dunlap,* 975 P.2d at 765; *Harlan,* 8 P.3d at 483. What the sponsors and proponents did not anticipate in 1995 was that they were relying on an opinion of the U.S. Supreme Court, which would be overturned.

In sum, the three-judge panels convened between 1995 and the *Ring* decision inherited the four-step process. This conclusion based on analysis of legislative history is consistent with our prior interpretation of the three-judge sentencing scheme. In 2001, we examined this sentencing system and concluded that "[i]n its examination of the appropriateness of a sentence of death, the three-judge panel follows the same four-fold inquiry that the pre-amendment statutory scheme assigned to the jury." *People v. Martinez,* 22 P.3d 915, 920 (Colo.2001).

Accordingly, in the penalty phase of a capital trial, the three-judge panel was required, in step one, to find at least one statutory aggravating factor beyond a reasonable doubt. § 16–11–103, 6 C.R.S. (2000); *see Dunlap,* 975 P.2d at 736. During this step, the three-judge panel considered all evidence that related to statutory aggravators. *See Dunlap,* 975 P.2d at 736. Step two required the three-judge panel to decide if evidence of mitigating factors existed. *Id.* During this step, the three-judge panel considered all mitigating evidence, including statutory and non-statutory mitigators. *Id.* at 739. In step three, the three-judge panel decided whether the mitigating factors outweighed the aggravating factors. *Id.* at 736. During this step, the three-judge panel had to be convinced beyond a reasonable doubt that any mitigating factors did not outweigh the proven statutory aggravating factors. *Id.* at 739. In making this decision, the three-judge panel considered any prosecution evidence offered to rebut mitigating factors raised by the defendant. *Id.* In step four, the three-judge panel determined whether the defendant should be sentenced to death. During this step, the three-judge panel considered all evidence relevant to the nature of the crime and the character of the defendant to determine whether death was the appropriate punishment. *Id.* at 740–41.

 Under this sentencing system, steps one, two, and three were prerequisites to a finding by the three-judge panel that a defendant was eligible for death. The Eighth Amendment requires that the death penalty be imposed fairly and with reasonable consistency, or not at all. *Id.* at 735. The sentencing statute must genuinely narrow the class of murderers eligible for the death penalty and must rationally distinguish between individuals for whom death is an appropriate sanction and those for whom it is not. *Id.* We concluded in *Harlan* and *Dunlap* that the first three steps of Colorado's four-step process constitutionally narrow the class of murderers to those who are eligible for imposition of the death penalty, and the fourth step affords the sentencing body unlimited discretion to sentence the defendant to life imprisonment instead of death. *Dunlap,* 975 P.2d at 735; *Harlan,* 8 P.3d at 483. In this fashion, Colorado's four-step process for imposing the death penalty satisfies Eighth Amendment requirements. *Id.*

We now return to the impact of *Ring* on the three-judge death penalty sentencing statute.

## C.

## Unconstitutionality of the Three–Judge Death Penalty Sentencing Statute

■ A statute is facially unconstitutional only if no conceivable set of circumstances exists under which it may be applied in a constitutionally permissible manner. *People v. Juvenile Court*, 893 P.2d 81, 93 (Colo. 1995). Because we respect the roles of the legislative and executive branches, we presume that statutes are constitutional; but we, not they, ultimately decide a statute's constitutionality. *Bd. of County Comm'rs v. Vail Assoc.*, 19 P.3d 1263, 1272–73 (Colo. 2001).

The judges who served on the *Woldt* and *Martinez* sentencing panels interpreted their penalty role as equivalent to the penalty role of jurors under the 1991 statute. They consciously engaged in the four-step process, citing *Dunlap* as authority. The panels considered a large amount of evidence, conducting a thirteen-day sentencing hearing for Woldt and a six-day sentencing hearing for Martinez. After weighing the evidence, the panels made findings of fact regarding aggravating circumstances and mitigating circumstances, and they found that the aggravating factors outweighed the mitigating factors. The three-judge panels arrived at these findings by reviewing guilt phase testimony presented to the juries as well as testimony and evidence presented during the sentencing hearing.

The three-judge panels correctly interpreted section 16–11–103, 6 C.R.S. (2000), as charging them with a fact-finding function. While we recognize that the General Assembly and the Governor reasonably relied on *Walton* for the constitutionality of the three-judge death penalty sentencing statute, *Ring* holds that death penalty eligibility fact-finding belongs solely to the jury under the Sixth Amendment. U.S. Const. amend. VI. In *Apprendi*, the U.S. Supreme Court states: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. In *Ring*, the court applied *Apprendi* to penalty imposition in capital cases. *Ring*, 122 S.Ct. at 2443.

Colorado's three-judge sentencing provision is unconstitutional on its face under *Ring*. Section 16–11–103, 6 C.R.S. (2000), provided that the three-judge panel could not sentence a defendant to death unless it found unanimously that "(A) At least one aggravating factor has been proved; and (B) There are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved." § 16–11–103(2)(b)(II)(A)–(B), 6 C.R.S. (2000). Section 16–11–103(2)(a)–(c), 6 C.R.S. (2000), was plain on the issue of the fact-finding role; it commanded the three-judge panels to support their penalty eligibility and selection decision, whether life or death, "by specific written findings:"

> The sentence of the panel of judges, whether to death or to life in prison, shall be supported by specific written findings of fact based upon the circumstances as set forth in subsections (4) and (5) of this section and upon the records of the trial and the sentencing hearing.

§ 16–11–103(2)(c), 6 C.R.S. (2000).

■ Under Colorado's constitution, our role in the separation of powers is to interpret Colorado law. *Vail Assoc.*, 19 P.3d at 1272–73. We conclude that the U.S. Supreme Court correctly characterized Colorado's death penalty law when, in *Ring*, it stated that Colorado assigns "both capital sentencing factfinding and the ultimate sentencing decision entirely to judges." *Ring*, 122 S.Ct. at 2442 n. 6. As Justice O'Connor accurately predicted, the U.S. Supreme Court effectively declared Colorado's capital sentencing statute unconstitutional. *Id.* at 2449 (O'Connor, J., dissenting).

Because the Sixth Amendment requires that a jury find any facts necessary to make a defendant eligible for the death penalty, and the first three steps of section 16–11–103, 6 C.R.S. (2000), required judges to make findings of fact that render a defendant eligible for death, the statute under which Woldt

and Martinez received their death sentences is unconstitutional on its face. We therefore reverse the death sentences that the three-judge panels imposed upon Woldt and Martinez.

### D.

### Life Imprisonment, Affirmance of the Death Penalty, or Remand for New Penalty Trial

■ We now turn to Woldt's and Martinez's arguments that Colorado law entitles them to a life sentence without the possibility of parole. The Attorney General counters that we have discretion—under legislation that the General Assembly adopted after *Ring*—to affirm the death penalties in these cases or to order new sentencing hearings, this time before a jury. We decline to exercise such discretion because to do so, we would have to (1) ignore the mandatory provision of section 18–1.3–401(5) directing re-sentencing to life imprisonment without the possibility of parole, in the event the death penalty statute is held unconstitutional; (2) make findings that judges cannot make under *Ring;* and (3) disregard principles of the ex post facto clauses of the United States and Colorado constitutions.

We conclude that Colorado law requires us to return these cases to the trial courts for sentencing of Woldt and Martinez to life imprisonment without the possibility of parole. Three considerations lead us to this conclusion.

### 1.

### The Discretionary and Mandatory Provisions Conflict

We first examine conflicting statutes currently in effect: one contains a mandatory re-sentence to life imprisonment if we determine the death penalty statute to be unconstitutional; the other grants us discretion to affirm the death penalties or to expose Woldt

and Martinez to new death penalty sentencing trials.

Section 18–1–105(5), 6 C.R.S. (2002)—which was in effect during the existence of the three-judge sentencing provision and continues to be in effect today at section 18–1.3–401(5), 6 C.R.S. (2002)—states: [19]

> *In the event the death penalty as provided for in this section is held to be unconstitutional by the Colorado supreme court or the United States supreme court, a person convicted of a crime punishable by death under the laws of this state shall be punished by life imprisonment. In such circumstance, the court which previously sentenced a person to death shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment.*

(emphasis added).

In contrast, section 18–1.4–102(8) & (9), 6 C.R.S. (2002)—which the General Assembly enacted during the 2002 Third Extraordinary Session—provides us discretion to affirm the death penalty in these cases or return them for a new capital sentencing proceeding, this time before a jury:

(8) *When reviewing a sentence of death imposed by a three-judge panel,* if the Colorado supreme court concludes that any one or more of the determinations made by the three-judge panel were constitutionally required to have been made by a jury, *the supreme court may* :

(a) Examine the record and the jury's verdicts or the defendant's guilty pleas at the guilt phase of the trial and determine whether any of the aggravating factors found to exist by the three-judge panel were also fairly determined to exist beyond a reasonable doubt by the jury's verdicts or the defendant's guilty pleas; and

(b)(I) If the supreme court determines that one or more aggravating factors were fairly determined to exist beyond a reasonable doubt by the jury's verdicts or the defendant's guilty pleas, the supreme court

---

**19.** Woldt and Martinez argue that section 16–11–103(7)(b), 6 C.R.S. (2001), which was in effect at the time of their crimes and sentencing, and which is in effect in slightly modified form today as section 18–1.3–1201(7)(b), 6 C.R.S. (2002),

also entitles them to a life sentence. In light of our construction of section 18–1.3–401(5), 6 C.R.S. (2002), we need not consider the effect of section 16–11–103(7)(b), 6 C.R.S. (2002).

shall determine whether the sentence of death should be affirmed on appeal by proceeding in accordance with the provisions of paragraphs (a) to (d) of subsection (9) of this section; or

(II) If the supreme court determines there were no aggravating factors fairly determined to exist beyond a reasonable doubt by the jury's verdicts or the defendant's guilty pleas, the supreme court shall remand the case to the trial court for a sentencing hearing before a newly impaneled jury.

(9) If, on appeal, the supreme court finds one or more of the aggravating factors that were found to support a sentence to death to be invalid for any reason, the supreme court may determine whether the sentence of death should be affirmed on appeal by:

(a) Reweighing the remaining aggravating factor or factors and all mitigating factors and then determining whether death is the appropriate punishment in the case; or

(b) Applying harmless error analysis by considering whether, if the sentencing body had not considered the invalid aggravating factor, it would have nonetheless sentenced the defendant to death; or

(c) If the supreme court finds the sentencing body's consideration of an aggravating factor was improper because the aggravating factor was not given a constitutionally narrow construction, determining whether, beyond a reasonable doubt, the sentencing body would have returned a verdict of death had the aggravating factor been properly narrowed; or

(d) Employing any other constitutionally permissible method of review.

(emphasis added).

By examining the legislative history of the above quoted section 18–1.4–102(8) & (9), 6 C.R.S. (2002), we determine that the General Assembly intended to provide a discretionary option which could result in the death of Woldt and Martinez despite the unconstitutionality of the three-judge death penalty sentencing statute under *Ring*.

The original version of the bill that was ultimately enacted as section 18–1.4–102(8), 6 C.R.S. (2002), used the term "shall" rather than "may," but was amended in the Senate Judiciary Committee. Steve Bernard, an Assistant District Attorney for Adams and Broomfield counties,[20] explained the change to the Senate Judiciary Committee:

[Amendment 18, L–018] essentially *address a single word found four different places in the bill,* and it had to do with the form of review that the supreme court would employ in cases in which there is a determination by a three-judge panel, and that *suggests that we change the shall language, from the supreme court shall follow a certain form of review to may. And the purpose for that is to provide the court with latitude that is consistent with the separation of powers doctrine.* Upon some reflection, we thought that perhaps telling the court what review it must engage in might be unnecessarily presumptuous.

Hearing on HB 02S–2005 before the Senate Judiciary Comm., 63rd Gen. Assemb., Third Extraordinary Sess. (July 9, 2002) (testimony of Steve Bernard)(emphasis added).

District Attorney Bob Grant, speaking on behalf of the District Attorney's Council before the Senate Judiciary Committee, expressed a similar basis for changing "shall" to "may":

Mr. Grant:

The clause [in] this amendment ... *striking "shall" and substituting "may"* .... I think what the concern was that you did not want to dictate to the supreme court, the legislative branch dictating to the judicial branch, so here you're saying, the court may do this, which of course is an absolute statement of truth. *They may do it, they may not, so instead of saying shall and in some kind of dictatorial fashion, it is merely permissive.*

Senator Ken Gordon:

So Bob, are they not able to now? This feels like déjà vu, because we do this a lot, we go from shall to may in bills, and do we need to say that they may do something, why do we need that in here?

Mr. Grant:

---

**20.** District attorneys assisted the legislature in drafting the 2002 capital sentencing legislation.

Mr. Chairman, my position, our position is that ... it's important that you make the statement that you are not saying [the three-judge panel system is] unconstitutional. Having made that statement, *it's important that you, as a matter of policy, indicate what you believe is available to appellate courts for cases that are currently existing. Does the supreme court have to follow you? You know, I don't think they do, regardless of what word you use there.* But as a policy statement, it is *from the legislature,* from the people of the State *to the court,* we'd like you to think about it, *we'd like you to think about what you can do* ....

Hearing on HB 02S–2005 before the Senate Judiciary Comm., 63rd Gen. Assemb., Third Extraordinary Sess. (July 10, 2002) (testimony of Bob Grant)(emphasis added).

Accordingly, the General Assembly, anticipating that we could find the three-judge death penalty sentencing statute unconstitutional on its face, created a patently conflicting choice between the mandatory provision for re-sentencing to life imprisonment and the discretionary procedure for affirming these two death sentences or ordering a new penalty phase trial, this time before a jury. The rules of statutory construction dictate our selection of the mandatory provision, given such a choice.

■ We assign words and phrases their commonly accepted and understood meaning. *Archibold v. Pub. Utils. Comm'n,* 58 P.3d 1031, 1038 (Colo.2002). Section 18–1.3–401(5), the mandatory provision, directs a life sentence by employing the word "shall." *See e.g. Pearson v. Dist. Court,* 924 P.2d 512, 516 (Colo.1996) ("The generally accepted and familiar meaning of 'shall' indicates that this term is mandatory."); *see generally People v. Aguayo,* 840 P.2d 336, 339 (Colo.1992) ("By its plain language, section [18–1.3–401(5)] contains a mandate that in the absence of [constitutional] sentencing procedures in accordance with section 16–11–103, the only penalty for a class 1 felony is life imprisonment.").

Section 18–1.4–102(8), 6 C.R.S. (2002), the optional provision, employs the term "may" in setting forth the alternative:

[I]f the Colorado supreme court concludes that any one or more of the determinations made by the three-judge panel were constitutionally required to have been made by a jury, the supreme court *may* [select one of several alternative actions to affirm these two death sentences or order resentencing before a jury].

(emphasis added).

Unlike the term "shall," a plain language analysis of "may" usually indicates discretion, but not always. *E.g. Danielson v. Castle Meadows, Inc.,* 791 P.2d 1106, 1113 (Colo. 1990) ("An alternate definition of the word 'may,' if used in a statute, is 'must' or 'shall.' "); *cf. People v. Triantos,* 55 P.3d 131, 134 (Colo.2002) ("The legislature's use of the term 'may' is indicative of a grant of discretion or choice among alternatives."). Indeed, "[t]here is no universal rule by which directory provisions may, under all conditions, be distinguished from those which are mandatory. The intention of the legislature, however, should be controlling and no formalistic rule of grammar or word form should stand in the way of carrying out the legislative intent." *Danielson,* 791 P.2d at 1113.

■ The rules of statutory construction provide that we adhere to the mandatory provision over the discretionary provision when the statutory provisions address the same legal question. *See People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986)("[T]he scope of what a court is *permitted* to do ... is limited by what it is *mandated* ") (emphasis in original). The legislative history we quote above demonstrates that the General Assembly, recognizing our role in the separation of powers, intended the provisions of section 18–1.4–102(8) & (9), 6 C.R.S. (2002), to be discretionary. The Attorney General said the same on oral argument of these two cases.

2.

*The Discretionary Provision Involves Factfinding Prohibited Under Ring*

The discretionary provision, section 18–1.4–102(8) & (9), 6 C.R.S. (2002), would in-

volve us in a series of determinations concerning the guilt phase and penalty phase records, the jury's guilty verdict, and the written findings and decision of the three-judge panel. In particular, under section 18–1.4–102(8)(a), 6 C.R.S. (2002), we would evaluate whether "any of the aggravating factors found to exist by the three-judge panel were also fairly determined to exist beyond a reasonable doubt by the jury's verdicts." This provision invites us to find whether the jury implicitly found one or more of the aggravating factors that the three-judge panels found in their written findings, and, if so, affirm these two death penalties.

The compound fact-finding involved in such process is manifest on the face of the 2002 legislation. Undertaking such a role conflicts with *Ring*. As we have held in this opinion, the 1995 amendments prohibited the jury from considering any penalty findings, the phase of the trial in which the three-step eligibility process of aggravating and mitigating circumstances consideration and fact-finding occurs under Colorado law; and the Sixth Amendment prohibited the three-judge panels from making such findings.

The 1995 amendments divided the trial into a guilt phase and a penalty phase and assigned the penalty phase to judges. The trial judges in both of the cases before us instructed the juries that they would not decide punishment. The trial judge instructed Woldt's jury that:

> If you decide that the prosecution has proved beyond a reasonable doubt that the defendant has committed the crime as charged, it will not be your job to decide what the punishment will be. You should not try to guess what the punishment might be. *It should not enter into your consideration at any time.*

(emphasis added). The court in *Martinez* gave a nearly identical instruction to its jury.

Under Colorado's four-step process, the juries' guilty verdicts for Woldt and Martinez, standing alone, can result only in life imprisonment. Increasing that punishment to death after *Ring* would involve us in making the three-step eligibility determination for death findings or eliminating the necessity of making such findings, contrary to *Ring*.

*See Ring*, 122 S.Ct. at 2439 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."). This option of affirming both death sentences would impermissibly place judges, the members of this court, in a fact-finding role regarding the existence or non-existence of aggravating factors based on the jury's verdict.

As an alternative, section 18–1.4–102(8)(b)(II) provides us with the choice of returning these two cases for new penalty proceedings by juries. Choosing this option would raise the ex post facto questions we discuss below.

### 3.

#### Ex Post Facto Questions

■ Application of the 2002 discretionary provision would raise significant ex post facto questions. When construing two conflicting statutes, we apply the statute that avoids raising a constitutional problem. *See Colo. Ground Water Comm. v. Eagle Peak Farms Ltd.*, 919 P.2d 212, 220 (Colo.1996).

■ The ex post facto clauses of the United States and Colorado constitutions, U.S. Const. art. I, § 9, cl. 3; Colo. Const. art. II, § 11, address the injustice that arises when government action alters the legal consequences of an event or act after the fact. The effect of a newly enacted law, not its form, is the crux of the inquiry. *See Weaver v. Graham*, 450 U.S. 24, 31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

■ We cannot give effect to a provision that "punishes as a crime conduct which was innocent when done, makes more onerous the punishment for a crime after its commission, or deprives a defendant of a defense that was available at the time the crime was committed." *People v. Dist. Court*, 834 P.2d 181, 199 (Colo.1992). Generally, a law does not violate the ex post facto clauses of the federal and Colorado constitutions as long as its punitive features do not apply to acts committed before the law be-

came effective. *People v. Billips,* 652 P.2d 1060, 1064 (Colo.1982).

■ Procedural changes to a law may fall within the category of laws prohibited by the ex post facto clause. We have long recognized that the ex post facto clause may prohibit procedural changes that deny an accused a defense available at the time of the commission of the offense or that affect the accused in a harsh or arbitrary manner. *Kolkman v. People,* 89 Colo. 8, 31–32, 300 P. 575, 584 (1931). On the other hand, changes in the mode of trial, which disadvantage the accused in a limited or unsubstantial manner are not prohibited. *Id.*

> Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation.

*Id.*

■ The ex post facto clauses are also "designed to place limitations on governmental power 'by restraining arbitrary and potentially vindictive legislation.'" *Gasper v. Gunter,* 851 P.2d 912, 916 (Colo.1993)(quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. 960).

We have explored the question of whether sentencing a defendant under a death penalty scheme that is put into effect after the defendant has committed the crime violates the ex post facto clause. In *District Court,* the prosecution appealed the court's ruling that it could not seek the death penalty against the defendant for a crime he committed in February 1991 because the 1988 death penalty statute, in effect in 1991, had been declared unconstitutional. *Dist. Court,* 834 P.2d at 184. After we declared the 1988 statute unconstitutional, the legislature enacted a bill with the express intent of making the death penalty available for people who committed an offense under that provision. *Id.* We found that the prosecution could seek the death penalty under the new statute because the defendant committed the offense before the death penalty was declared unconstitutional; therefore, he had fair warning that death was a possible punishment for first-degree murder and the subsequent statute did not authorize a more onerous punishment than the punishment authorized by the judicially invalidated statute. *Id.* at 197–202. Consequently, the application of the new statute in *District Court* did not violate the prohibition against ex post facto legislation.[21]

In the cases before us, a key difference exists. Woldt and Martinez have been sentenced under an unconstitutional statute. This raises at least two ex post facto concerns. First, the mandatory provision of section 18–1.3–401(5), 6 C.R.S. (2002), dictates life imprisonment as the remedy for this constitutional violation. Application of the discretionary option under section 18–1.4–102(8) & (9), 6 C.R.S. (2002), to these cases would extinguish the benefits to Woldt and Martinez of this statutory right to life imprisonment. Second, Woldt and Martinez were identifiable targets of the legislation because section 18–1.4–102(8) & (9), 6 C.R.S. (2002), focused only on three persons who received the death penalty from a three-judge panel.[22] In *District Court,* we recognized that legislative targeting was not a concern because, although the defendant was arrested prior to enactment of the new bill, he was not an identifiable target of the legislation because he had not been convicted of a crime securing his eligibility for the imposition of death.

---

**21.** Our decision in *District Court* adopted and applied the United States Supreme Court's rationale in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

**22.** The Governor's Executive Order calling the General Assembly into Extraordinary Session referenced three persons who had received a death sentence from three-judge panels:

> Since July 1, 1995, three convicted defendants have been sentenced to death by a three-judge panel. Colorado's three-judge panel has been a fair and effective system for determining whether the death penalty is appropriate in each case and the death sentence applied in the three cases was the correct decision.

Exec. Order No. D 020 02, Sixty-Third General Assembly, Third Extraordinary Session. These three persons are Woldt, Martinez, and Cody Neal. The legislative history of the 2002 amendments contains numerous mentions of these three individuals.

*Dist. Court,* 834 P.2d at 195–96. This rationale does not apply in this case.[23] Therefore, application of the discretionary provision raises federal and state ex post facto constitutional issues because the legislation permitting resentencing was enacted after the defendants' crimes, trial, and sentencing, and the issuance of *Ring.*

Informed by the rules of statutory construction, we give effect to the mandatory statutory provision for life imprisonment. *See Eagle Peak Farms Ltd.,* 919 P.2d at 212.

### III.

Accordingly, we hold that the three-judge panel penalty statute, section 16–11–103, 6 C.R.S. (2000), is unconstitutional on its face, and we reverse the death sentences imposed upon Woldt and Martinez under that statute. Under section 18–1.3–401(5), 6 C.R.S. (2002), we return these cases to the trial court for re-sentencing of Woldt and Martinez to life imprisonment without the possibility of parole.

Justice COATS does not participate.

---

**23.** Other jurisdictions have refused to apply *Dobbert,* 432 U.S. at 282, 97 S.Ct. 2290, in these circumstances. *See State v. Rodgers,* 270 S.C. 285, 242 S.E.2d 215 (1978); *Meller v. State,* 94 Nev. 408, 581 P.2d 3 (1978).