Andrew VITETTA and Janine Vitetta, individually and as parents and next friends for K.M.V., a Minor, Plaintiffs–Appellants and Cross–Appellees,

v.

Kevin CORRIGAN, M.D. and Colorado Springs Health Partners, P.C., Defendants–Appellees and Cross–Appellants

and

Fortis Insurance Company, Intervenor–Appellee and Cross–Appellant.

No. 07CA0687.

Colorado Court of Appeals, Div. VII.

Aug. 20, 2009.

As Modified on Denial of Rehearing Oct. 15, 2009.

Leventhal, Brown & Puga, P.C., Jim Leventhal, Benjamin Sachs, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Montgomery, Little, Soran & Murray, P.C., C. Gregory Tiemeier, C. Todd Drake, Greenwood Village, Colorado, for Defendant–Appellee and Cross–Appellant Kevin Corrigan, M.D.

Jaudon & Avery, LLP, Joseph C. Jaudon, David H. Yun, Jared R. Ellis, Denver, Colorado, for Defendant–Appellee and Cross–Appellant Colorado Springs Health Partners, P.C.

Burg Simpson Eldredge Hersh & Jardine, P.C., Diane Vaksdal Smith, Englewood, Colorado, for Intervenor–Appellee and Cross–Appellant.

Opinion by Judge CONNELLY.

Plaintiffs, Andrew and Janine Vitetta, obtained a multi-million dollar negligence verdict for post-natal injuries to their minor daughter ("the child"). We decide two issues in their appeal as to defendants, Kevin Corrigan, M.D., and Colorado Springs Health Partners, P.C. (CSHP). First, we hold an amended statute authorizing legal representatives of disabled persons to elect a lump sum in lieu of periodic payments applies to this case and is constitutional as applied. Second, we uphold the district court's discretionary ruling declining to find good cause to exempt the future lost earnings award from the statutory cap. We also decide subrogation issues involving plaintiffs and intervenor, Fortis Insurance Company. We affirm in part, reverse in part, and remand for entry of a lump-sum judgment in favor of plaintiffs.

## I. Background

Plaintiffs sued several health care professionals and entities. They ultimately settled claims against Penrose Community Hospital (Penrose) and other defendants. Their claims against three defendants—Dr. Corrigan, another doctor, and CSHP—were tried to a jury. Those defendants designated Penrose as a nonparty at fault.

The jury's special verdict found Dr. Corrigan and CSHP fifty-five percent at fault, the other doctor not at fault, and nonparty Penrose forty-five percent at fault for the child's serious injuries. All told, it found the child had suffered and would suffer some $12 million in specified damages.

The court then imposed statutory caps and apportioned the jury award. It divided the damages in three categories: (1) roughly $4.3 million that had to be capped at $1 million; (2) roughly $6.7 million for future "life care" and medical expenses that could be awarded upon a good cause finding; and (3) $970,000 for future lost earnings that likewise could be awarded upon a good cause finding.

The court began with a $1 million award and (without objection from defendants) found good cause to add the $6.7 million in future life care and medical expenses. As to the $970,000 in future lost earnings, however, the court declined to find good cause for exceeding the caps.

These rulings yielded post-cap damages of some $7.7 million, which then had to be apportioned based on the jury's fault findings. Apportioning fifty-five percent of the damages to defendants left them responsible for almost $4.3 million in damages.

The court entered judgment in favor of plaintiffs and against defendants for just under $4.3 million. Over plaintiffs' objections, it ordered the roughly $4.1 million comprising future damages paid periodically by defendants' insurer. Over defendants' objections, however, the court carved out the forty percent of this amount (some $1.6 million) to which plaintiffs' attorneys were entitled under their contingent fee agreement and ordered it paid immediately. The final judgment thus requires that the remaining future damages be satisfied by defendants' insurer making monthly payments of prescribed amounts (increasing each year) over the next twenty-five years.

## II. Discussion

### A. Lump Sum Versus Periodic Payment of Damages

The initial issues raised by these appeals stem from plaintiffs' claim that the future damages be paid in a present value lump sum rather than in twenty-five years of periodic payments. This claim raises issues of retroactivity because it relies on statutory amendments enacted after judgment was entered. We decide these legal issues of retroactivity and statutory construction de novo. *People v. Chavarria–Sanchez,* 207 P.3d 902, 904 (Colo.App.2009).

#### 1. Statutory Overview

The Health Care Availability Act (HCAA) generally provides for medical malpractice judgments awarding future damages with a present value above $150,000 to "be paid by periodic payments rather than by a lump-sum payment." § 13–64–203(1), C.R.S.2008. But at all relevant times, there were exceptions. Some plaintiffs could "elect to receive the immediate payment . . . of the present value of the future damage award in a lump-sum amount in lieu of periodic payments." § 13–64–205(1)(f), C.R.S.2008.

Prior to 2007, the HCAA predicated the right to immediate payment on a plaintiff personally being of sufficient age and capacity. The plaintiff had to be at least twenty-one years old, not be "incapacitated," and "be making an informed decision" after having "been provided financial counseling." Ch. 100, sec. 1, § 13–64–205(1)(f), 1988 Sess. Laws 615.

In 2007, the General Assembly broadened the class of plaintiffs entitled to elect immediate payments. Ch. 49, sec. 2, § 13–64–205(1)(f), 2007 Sess. Laws 172. It left intact the right of competent adults to make such elections, though it lowered the age of adulthood from twenty-one to eighteen. § 13–64–205(1)(f)(I).

The amended statute now extends election rights to "a person under disability who has a

legal representative authorized to take action on his or her behalf." § 13–64–205(1)(f)(II); *see* §§ 13–81–101(4) & –102(2)(b), C.R.S.2008 (legal representative's right to elect immediate payment of future damages on behalf of person under disability). Formerly, any election of a lump-sum payment had to be made "[w]ithin no more than three months after the entry of verdict by the trier of fact and before the court enters judgment for periodic payments." Ch. 100, sec. 1, § 13–64–205(1)(f), 1988 Sess. Laws 615. That requirement was eliminated in 2007.

### 2. Procedural History

The trial court denied plaintiffs' requests for a lump-sum payment, holding the then-existing statute required periodic payments. Plaintiffs timely noticed their appeal from the final judgment entered in April 2007. The statutory amendments took effect in August 2007, whereupon plaintiffs moved the trial court to amend the judgment under C.R.C.P. 60(b)(5). A motions division of this court denied plaintiffs' motion for a limited remand, and the trial court quite properly has indicated it will not rule on the Rule 60(b) motion while this appeal remains pending.

### 3. Analysis

#### a. Plaintiffs may rely on the amended statute.

Defendants ask us not to apply the amended statute by following our general practice of not considering arguments "raised for the first time on appeal." *Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n. 5 (Colo.1992); *but cf. Robinson v. Colorado State Lottery Division*, 179 P.3d 998, 1008–09 (Colo.2008) (appellate courts have discretion to relax this practice in rare cases). We hold that plaintiffs may rely on the amended statute.

We decline to create a catch–22 in which an appellant could never rely on a new statute that took effect during a pending appeal. Doing so would contravene a two-century-old rule that:

> if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, ... [the appellate] court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside.

*United States v. Schooner Peggy,* 1 Cranch 103, 5 U.S. 103, 110, 2 L.Ed. 49 (1801) (Marshall, C.J.).

■ The rule is not as absolute as Chief Justice Marshall's language might suggest because courts now presume against retroactivity. *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see* § 2–4–202, C.R.S.2008 ("A statute is presumed to be prospective in its operation."). It remains true, however, that "[w]hen a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 226, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), *quoted in City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 444 (Colo.2000).

#### b. The amended statute was intended to apply here.

■ In deciding whether a new statute should be given retroactive effect, the first issue is "whether the General Assembly intended the challenged statute to operate retroactively." *City of Colorado Springs v. Powell,* 156 P.3d 461, 465 (Colo.2007). Such intent may be discerned from either the statutory language or (more controversially) its legislative history. *Id.* at 465–68; *see id.* at 468–69 (Eid, J., with Coats, J., concurring in part and specially concurring in part) (criticizing consideration of legislative history).

■ The statutory language here makes pellucid the legislative intent that the amendments apply to pending cases such as this one. It directs that the new provisions "shall apply to civil actions pending on or after" the

effective date of August 3, 2007. Ch. 49, sec. 5, 2007 Colo. Sess. Laws 173.

■ A case remains "pending" after entry of judgment and while the case is on appeal. *See In re Custody of Rector,* 39 Colo.App. 111, 114, 565 P.2d 950, 952 (1977) ("under the common law of Colorado a civil case is deemed 'pending' until final determination on appeal") (citing *People ex rel. Grenfell v. Dist. Court,* 89 Colo. 78, 83, 299 P. 1, 3 (1931)). Thus, new judicial decisions generally apply to cases "pending on direct appeal." *Lopez v. People,* 113 P.3d 713, 716 (Colo.2005); *accord Danforth v. Minnesota,* 552 U.S. 264, 265–66, 128 S.Ct. 1029, 1032, 169 L.Ed.2d 859 (2008). The view that cases remain "pending" while on appeal is "consistent with that word's ordinary meaning." *Carey v. Saffold,* 536 U.S. 214, 219–20, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002); *accord Snyder v. Buck,* 340 U.S. 15, 20, 71 S.Ct. 93, 95 L.Ed. 15 (1950); *Mackenzie v. A. Engelhard & Sons Co.,* 266 U.S. 131, 142–43, 45 S.Ct. 68, 69 L.Ed. 205 (1924); *V–1 Oil Co. v. People,* 799 P.2d 1199, 1203 (Wyo.1990) (citing additional cases).

We reject defendants' argument that legislative intent for retroactivity can be manifested only by making the law applicable to pending "civil actions" *and* "appeals" thereof. A case does not lose its status as a "civil action," C.R.C.P. 2, simply because an appeal is filed. *See* C.R.C.P. 1 (rules of civil procedure govern both appellate and trial courts in all "proceedings of a civil nature"). Because this case remains a civil action, and a civil action remains pending while on appeal, drafting the statute to cover both pending "civil actions" and pending "appeals" would be redundant.

We are not persuaded by defendants' grammatical argument based on the tense of a word in the Act's preamble. Among the enumerated statutory purposes was providing access to benefits of a judgment to "each disabled individual who *receives* a judgment." Ch. 49, sec. 1(1)(a), 2007 Colo. Sess. Laws 171 (emphasis added). Defendants argue that the legislature would have used the past tense (expressing intent to benefit those who "received" judgments) had it intended retroactivity. But the preamble does not address

retroactivity, and we decline to read it by negative implication to preclude retroactivity.

### c. Applying the amended statute retroactively would not be unconstitutionally retrospective.

■ Defendants contend that applying the amended statute here would violate the state constitutional bar on "retrospective" laws, Colo. Const. art. II, § 11. A statute is not retrospective if it "effects a change that is only procedural or remedial in nature" and does not "create, eliminate, or modify vested rights or liabilities." *Shell Western E & P, Inc. v. Dolores County Board of Commissioners,* 948 P.2d 1002, 1012 (Colo.1997); *accord* 2 Norman J. Singer, *Sutherland Statutory Construction* § 41:9, at 451 (6th ed.2001).

■ The amended statute is plainly remedial in that it extends to incapacitated plaintiffs the ability to obtain a form of damages. The former statute allowing only competent adult plaintiffs to elect that remedy was constitutional because it rationally furthered a legitimate state interest in "protecting" incapacitated persons "from prematurely exhausting their judgments." *HealthONE v. Rodriguez,* 50 P.3d 879, 894 (Colo.2002). The legislature now has decided the interests of disabled persons in being free from "discrimination" entitle them to the same "meaningful access to the benefits of the judgment." Ch. 49, sec. 1(1)(a), 2007 Colo. Sess. Laws 171.

These new remedial rights do not eliminate any substantive right formerly vested in defendants. The present and future value "conversions" required in HCAA cases, *see HealthONE,* 50 P.3d at 895–96, are meant to create substantive equivalency between immediate and periodic payments of future damages awards.

We recognize that, even with present value and interest rate adjustments, the difference between immediate and periodic payment "can have an enormous effect on the plaintiff's judgment." *Id.* at 896. There is a difference between paying a debt immediately and paying it over time. Also, the obligation to make periodic "[p]ayments for future damages other than loss of future

earnings shall cease at the death of the [plaintiff] judgment creditor." § 13–64–206(3), C.R.S.2008.

Nonetheless, defendants had no *vested* right to the potential benefits of paying the judgment over time rather than immediately. Trial courts always had discretion to require defendants to satisfy a periodic payment obligation by paying the full undiscounted amount up front to purchase an annuity. *See* § 13–64–207(1)(a), C.R.S.2008; *Garhart ex rel. Tinsman v. Columbia/HealthONE, L.L.C.,* 168 P.3d 512, 516–18 (Colo.App.2007). And even defendants who previously were allowed to pay a judgment over time had no *vested* right in the possibility that the beneficiary of the judgment might die earlier than expected and potentially spare them some future payments.

Nor did defendants obtain any vested right simply because the trial court entered a judgment allowing periodic payments. That judgment was "final" for purposes of appeal, *see* § 13–4–102(1), C.R.S.2008, but precisely because it could be reversed on appeal, the parties' rights in it could not have vested. Procedural or remedial rights in a judgment vest, and thereby become immune from retroactive legislation, only when all direct appeals are finally decided or the time for direct appeal expires. 16A *Corpus Juris Secundum Constitutional Law* § 422, at 94 (2005) (there is "no vested right" in a judgment "while it remains ... subject to appellate review"); *see, e.g., Johnston v. Cigna Corp.,* 14 F.3d 486, 489 n. 4 (10th Cir.1993); *District of Columbia v. Beretta U.S.A. Corp.,* 940 A.2d 163, 176 (D.C.2008); *Vaughn v. Nadel,* 228 Kan. 469, 618 P.2d 778, 783–84 (1980); *Fletcher v. Tarasidis,* 219 Va. 658, 250 S.E.2d 739, 740 (1979); Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692, 717–19 (1960).

#### d. The amended statute is not unconstitutional special legislation.

Defendants contend the statute is unconstitutional under Colo. Const. art. V, § 25. Article V, section 25 bars "special laws" in enumerated types of cases, including those "regulating the practice in courts of justice" or granting an individual or entity "any special or exclusive privilege, immunity or franchise whatever." *Id.*

This state constitutional provision bars laws targeted at specific parties and incapable of more general application. *See People v. Canister,* 110 P.3d 380, 382–86 (Colo.2005). The primary issue is whether the law is "so logically and factually restricted" that it could only apply to those specifically targeted. *In re Interrogatory Propounded by Governor Roy Romer on H.B. 91S–1005,* 814 P.2d 875, 887 (Colo.1991). In *Canister,* the court invalidated an amendment to a death penalty statute where there were "only two people to whom it will ever apply." 110 P.3d at 385. Where a law potentially applies to a broader class of persons, the only remaining issue is "whether the classification is reasonable." *Id.* at 383. Defendants' special legislation argument in this case does not raise a reasonableness challenge nor would any such challenge have merit.

The amended statute is not unconstitutional special legislation because, by covering all minor and incapacitated persons who receive large medical malpractice verdicts, it plainly has general future applicability. Defendants argue that applying it retroactively, however, would make it special legislation because this was the only pending case that would be covered retroactively.

The record does not disclose whether, as defendants assert, this was the only pending case affected by the statute. Regardless, all that is required is the *potential* for broader applicability. *Interrogatory on H.B. 91S–1005* upheld a proposed law immediately benefiting only one airline because "it could not be said that 'no entity other than United Airlines will *ever* meet the statutory criteria set forth in H.B. 1005.'" *Canister,* 110 P.3d at 384 (quoting and adding emphasis to 814 P.2d at 887); *see id.* (citing other cases in which "[p]otential future applicability" sufficed for laws affecting only one or two parties at the time). The prohibition against special legislation does not mandate prospectivity of a statute that is potentially appli-

cable to many future persons while in effect. The amended statute is not unconstitutional special legislation either in general or as applied here.

### B. Other Contentions Relating to Periodic Payments

Plaintiffs' appeal and defendants' cross-appeal raise other issues involving periodic payments. Plaintiffs contend the court erred by allowing defendants' insurer to "self-fund" those payments instead of immediately funding an annuity. Defendants contend the court erred in ordering immediate payment of forty percent of the judgment to plaintiffs' attorneys. These respective contentions are moot as a result of our holding that plaintiffs are entitled to elect immediate payment of the entire judgment.

### C. Good Cause to Exceed Cap for Future Lost Earnings

Plaintiffs argue the court should have uncapped the future lost earnings award from statutory limits. The HCAA, at the time of the underlying action, established an overall $1 million damages cap but allowed higher awards of "the present value of additional future damages only for loss of such excess future earnings, or such excess future medical and other health care costs, or both." Ch. 105, sec. 1, § 13–64–302(1)(b), 1995 Colo. Sess. Laws 317. (The current version of the HCAA continues to allow uncapping of "economic damages." § 13–64–302(1)(b), C.R.S. 2008.)

 A trial court may award future lost earnings above $1 million "if, upon good cause shown," it "would be unfair" to apply the $1 million limit. § 13–64–302(1)(b). In making findings as to "good cause" and "unfairness" (which essentially are different ways of saying the same thing), trial courts must consider the "totality of circumstances." *See Wallbank v. Rothenberg*, 140 P.3d 177, 179–81 (Colo.App.2006). Appellate review is limited by the abuse-of-discretion standard. *Id.* at 179.

 The trial court here issued a written opinion that found there was "no need to compensate [the child] for loss of future in-

come when her daily living expenses are already included in" the uncapped multi-million dollar award for future "life care" and medical expenses. Plaintiffs challenge this finding by citing their expert economist's opinion that the "life care plan" developed by another expert "does not provide [for] food, clothing and other expenses." After reviewing the trial testimony of plaintiffs' expert witness Helen Woodward, we conclude there was record support for the trial court's finding that the child's life care plan provides for her basic necessities. As to food, for example, the plan assumes the child will remain on a feeding tube for the rest of her life and includes the costs of feeding tubes and bags of feeding supplements. The plan provides for twenty-four-hour care and for the expenses of modifying a wing of the family home or possibly an apartment across the street to accommodate the child's special needs. Plaintiffs have not shown any clear error or abuse of discretion in the trial court's finding that the life care plan sufficiently provides for the child's future needs.

 We reject plaintiffs' contention that there is a *constitutional* problem with the trial court's further consideration of the child's lack of prior earnings. This is a permissible consideration under *Wallbank*, 140 P.3d at 179, and easily survives plaintiffs' equal protection challenge under a rational basis standard. *See generally Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 601, 128 S.Ct. 2146, 2153, 170 L.Ed.2d 975 (2008) (discussing rational-basis review); *HealthONE*, 50 P.3d at 892–96 (same in context of HCAA). It is rational to treat those with no earnings history differently than those with prior earnings because that distinction bears on the need to be compensated for future lost earnings. The trial court's consideration of lack of prior earnings as one factor in evaluating good cause/unfairness did not deny equal protection to the child.

### D. Past Medical Expenses and Subrogation

The jury awarded $345,000 for past medical expenses.

Insurer Fortis previously had discharged plaintiffs' liability for these expenses by pay-

ing $274,000 to medical providers. The trial court accordingly: (1) reduced the jury award from the billed amount of $345,000 to the $274,000 actually paid; and (2) ordered that Fortis was entitled to the proportionate share of that $274,000 judgment.

### 1. The Reduction to the Amount Actually Paid

Plaintiffs, in an argument first developed in their reply brief, claim the trial court should not have reduced the past medical expenses award from the billed amount of $345,000 to the $274,000 actually paid. We decline to consider this argument because: (1) we do not consider appellate arguments raised for the first time in a reply brief, *see Meadow Homes Development Corp. v. Bowens,* 211 P.3d 743, 748 (Colo.App.2009); (2) plaintiffs never raised it in the trial court, *see Farmers Ins. Exchange v. Benzing,* 206 P.3d 812, 815 (Colo.2009); and (3) the reduction made no difference, given that the past medical expenses (whether $345,000 or $274,000) were included among the roughly $4.3 million damages capped at $1 million.

### 2. Insurer Fortis's Subrogation Rights

Plaintiffs next contend that Fortis should not have been awarded the $274,000 it paid for medical expenses. The trial court ruled that Fortis could recover this entire amount by receiving the proportionate fifty-five percent share of the $274,000 in this judgment and the remainder from the Penrose settlement proceeds.

■ Plaintiffs' contention implicates collateral source and subrogation principles. Those principles determine who—among an injured plaintiff, a plaintiff's insurer, and a tortfeasor—should bear ultimate responsibility for past medical expenses incurred by a plaintiff and paid by the insurer.

■ The collateral source rule precludes *defendants* from limiting plaintiffs' recovery of damages for past medical expenses paid by Fortis. *See generally Colorado Permanente Medical Group, P.C. v. Evans,* 926 P.2d 1218, 1230 (Colo.1996) (discussing common law version of the rule and statutory modification in § 13–21–111.6, C.R.S.2008,

which continues to apply the rule to payments received pursuant to insurance contracts paid for by tort plaintiffs). The reasoning behind the rule is that "[t]o the extent that either party received a windfall, it was considered more just that the benefit be realized by the plaintiff in the form of double recovery than by the tortfeasor in the form of reduced liability." *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1074 (Colo. 1992).

■ The right of subrogation provides that "when an insurer has paid its insured for a loss caused by a third party, it may seek recovery from the third party." *DeHerrera v. American Family Mut. Ins. Co.,* 219 P.3d 346, 350 (Colo.App.2009). The HCAA establishes special procedural requirements by which, unlike in other types of tort actions, subrogation issues must be resolved directly in the medical malpractice action itself rather than in separate litigation. *See* John W. Grund & J. Kent Miller, 7A Colo. Prac., *Personal Injury Torts and Insurance* § 37.40, at 213 (2d ed.2000). A medical malpractice plaintiff must notify the reimbursing insurer within sixty days of commencing the action; an insurer then must file a subrogation claim within the next ninety days; and "[b]efore entering final judgment, the court shall determine the amount, if any, due the [insurer] and enter its judgment in accordance with such finding." § 13–64–402(1)–(3), C.R.S.2008.

■ Contrary to plaintiffs' contention, the "anti-subrogation" rule did not preclude Fortis's subrogation claim. The rule prevents an insurer from "passing the loss back to its insured" by seeking recovery against its insured for having paid a covered claim. *See DeHerrera,* 219 P.3d at 351 (citing *Continental Divide Ins. Co. v. W. Skies Mgmt., Inc.,* 107 P.3d 1145, 1148 (Colo.App.2004)). It does not prevent an insurer from "'stand[ing] in the shoes" of its insured" to "seek recovery from [a] third party" tortfeasor and thereby avoid "double recovery" by plaintiffs. *Id.* at 350 (internal quotations omitted).

■ Here, the trial court properly allowed Fortis to recover its prior payments on

behalf of plaintiffs from defendants. Allowing such recovery does not violate the anti-subrogation rule because it neither passes the loss back to plaintiffs nor denies them the full benefits of their insurance contract with Fortis. *See id.* at 351–52. Instead, allowing Fortis to recover from defendants the amount it previously paid ensures that neither plaintiffs nor Fortis will suffer any ultimate loss as a result of the past medical expenses resulting from defendants' negligence.

Plaintiffs finally argue that the trial court should have limited the reimbursement to Fortis by applying "common fund" principles to impose some share of the fees and costs of this litigation or to reflect some part of the $1 million cap on certain damages. We are not convinced these arguments were raised in a timely and adequate fashion in the trial court. Even if we considered common-fund arguments, it would remain within the trial court's discretion to decide whether Fortis should recover less than the full amount of its prior payments. We conclude that, given the manner in which these arguments were raised, the trial court sufficiently made clear its view that Fortis's subrogation rights should not be limited. There was no abuse of discretion. This ruling renders moot Fortis's cross-appeal arguing to unseal the particulars of plaintiffs' settlement with the Penrose defendants.

### III. Conclusion

The judgment is reversed as to the claim for a lump-sum payment and affirmed in all other respects. The case is remanded to the trial court with instructions to enter a lump-sum judgment in favor of plaintiffs together with post-judgment interest. Such interest shall be calculated at the annual interest rates certified by the secretary of state pursuant to section 13–21–101(3) and (4), C.R.S. 2008, as follows: (1) on the amount of the lump-sum judgment that has not yet been deposited by the defendants with the registry of the court from the date of the original judgment to the date of satisfaction; and (2)

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

on any monthly payments deposited with the registry of the court from the date of the original judgment to the date the payment is or was deposited.

JONES and ROTHENBERG *, JJ., concur.

