Plaintiff–Appellant: The PEOPLE
of the State of Colorado,

v.

Defendant–Appellee: Randy CANISTER,

No. 03SA170.

Supreme Court of Colorado.

April 18, 2005.

Carol A. Chambers, District Attorney, Eighteenth Judicial District, Paul R. Wolff, Chief Deputy District Attorney, Centennial, for Petitioners.

Law Office of Michael G. Root, Michael G. Root, Samler & Whitson, P.C., Hollis A. Whitson, Denver, Lindy Frolich, The Law Office of Lindy Frolich, LLC, Denver, for Respondent.

Justice COATS dissents, and Justice KOURLIS joins in the dissent.

MULLARKEY, Chief Justice.

## I. Introduction

In this case, we review the constitutionality of section 18–1.4–102(1)(e), 6 C.R.S. (2002), which established a sentencing procedure for certain death penalty cases that were pending when *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), was decided. We conclude that the statutory provision is special legislation in violation of article V, section 25 of the Colorado Constitution. Accordingly, the prosecution may not seek the death penalty against Randy Deon Canister under that section, or the capital sentencing scheme in place at the time of his conviction. We therefore uphold the order of the trial court, and remand the case for imposition of a life sentence without the possibility of parole on Canister.

## II. Facts and Procedural History

Canister was arrested and charged with 1) three counts of felony murder,[1] 2) three counts of first degree murder after deliberation,[2] 3) criminal attempt to commit first degree murder after deliberation,[3] 4) conspiracy to commit murder after deliberation,[4] 5) first degree sexual assault,[5] 6) second degree kidnapping,[6] 7) four counts of aggravated robbery,[7] and 8) accessory to a crime.[8] His trial commenced on June 21, 2002.

Prior to trial, the prosecution announced its intention to seek the death penalty. At the time, Colorado's capital sentencing procedures were set forth in section 16–11–103, 6 C.R.S. (2001). If a defendant was convicted of a crime eligible for the death penalty, the procedures provided for a panel of three judges to determine, based on findings of the presence or absence of aggravating and mitigating factors, whether a defendant should receive a sentence of death or life imprisonment. The General Assembly enacted the three-judge capital sentencing statute in 1995 in reliance on *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which had approved of an Arizona statute allowing a judge, sitting without a jury, to make such determinations.

Three days into Canister's trial, on June 24, 2002, the United States Supreme Court announced its decision in *Ring*. The Court in *Ring* ruled that the Arizona capital sentencing statute, which provided for sentencing procedures similar to Colorado's statute, violated the defendant's Sixth Amendment right to a jury trial. Based on its decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court held that capital defendants are entitled to a jury determination of the aggravating factors necessary for the imposition of the death penalty. In so doing, the Court overruled its earlier decision in *Walton*, and effectively declared Colorado's capital sentencing statute unconstitutional.

In response to *Ring*, the Governor called a special legislative session on July 1, 2002, to consider legislation "concerning the implementation of a capital punishment sentencing structure that comports with the recent decisions of the United States Supreme Court." *Proclamation Call for the Third Extraordinary Session of the Sixty–Third General Assembly, reprinted in* 2002 Colo. Sess. Laws, 3rd Extraordinary Sess. vii, viii. The General Assembly convened on Monday, July 8, 2002, and adjourned *sine die* on Thursday, July 11, 2002. 2002 Colo. Sess. Laws, 3rd Extraordinary Sess.

During the session, the legislature passed a bill abolishing the three judge panel and returning responsibility for the capital sentencing determination to the jury that heard the guilt phase. § 18–1.4–102, C.R.S. (2004). As part of the bill, the legislature enacted section 18–1.4–102(1)(e), which provides:

> If, as of July 12, 2002, the prosecution has announced it will be seeking the death

1. § 18–3–102(1)(b), 6 C.R.S. (1998).

2. § 18–3–102(1)(a), 6 C.R.S. (1998).

3. § 18–2–101, 6 C.R.S. (1998).

4. § 18–2–201, 6 C.R.S. (1998).

5. § 18–3–402(1)(a), 6 C.R.S. (1998).

6. § 18–3–302(3)(a), 6 C.R.S. (1998).

7. § 18–4–302, 6 C.R.S. (1998).

8. § 18–8–105, 6 C.R.S. (2002).

sentence as the punishment for a conviction of a class 1 felony and a defendant has been convicted at trial of a class 1 felony or has pled guilty to a class 1 felony, but a sentencing hearing to determine whether the defendant shall be sentenced to death or life imprisonment has not yet been held, a jury shall be impaneled to determine the sentence at the sentencing hearing pursuant to the procedures set forth in this section or, if the defendant pled guilty or waived the right to a jury sentencing, the sentence shall be determined by the trial judge.

The bill was approved by the Governor on July 12, 2002, and became effective that same day. Canister and Abraham Hagos, the defendant in the companion case also decided today, were and are the only two people to whom the provisions of this section could ever apply.

The legislature's stated purpose behind the statute was to ensure "that there [was] no hiatus in the imposition of the death penalty" as a result of *Ring.* § 18–1.4–101(1), C.R.S. (2004). The jury found Canister guilty of all charges on July 9, 2002, while the legislature was meeting in its four-day special session. Canister was awaiting sentencing when the new law became effective.

In a post-trial motion, Canister alleged that the state was precluded from seeking the death penalty against him under section 18–1.4–102(1)(e) because that section was unconstitutional. Before the trial court ruled on Canister's motion, we announced *Woldt v. People*, 64 P.3d 256, 259 (Colo.2003), declaring Colorado's three judge capital sentencing statute "to be unconstitutional on its face under *Ring.*" The trial court in Canister's case found that section 18–1.4–102(1)(e) violated constitutional prohibitions against special legislation, bills of attainder and, in light of *Woldt,* ex post facto laws. Additionally, the court ruled that section 18–1.4–102(1)(e) deprived Canister of due process "because there is no written scheme for a new jury to consider the circumstances of the offense of which he was convicted." The trial court concluded that because "the defendant could not have been constitutionally sentenced to death as of the last day of his trial, and since

this court finds that the current sentencing scheme is also unconstitutional," the prosecution could not seek the death penalty.

The prosecution appealed the trial court's ruling to this court pursuant to section 16–12–102(1), C.R.S. (2004). We now uphold the court's ruling that section 18–1.4–102(1)(e) is unconstitutional, on the grounds that it contravenes the Colorado Constitution's prohibition on special legislation.

### III. Analysis

Article V, section 25 of the Colorado Constitution decrees:

the general assembly shall not pass local or special laws in any of the following enumerated cases, ..., regulating the practice in the courts of justice; ... summoning or impaneling grand or petit juries; ... In all other cases, where a general law can be made applicable, no special law shall be enacted.

This provision, which has been part of the Colorado Constitution since its adoption in 1876, has no counterpart in the United States Constitution. The prohibition against special legislation was enacted, in part, "for the purpose of preventing class legislation—that is, legislation that applies to some classes but not to others without a reasonable basis for distinguishing between them." *City of Montrose v. Pub. Util. Comm'n of the State of Colorado,* 732 P.2d 1181, 1190 (Colo.1987). Prior to our announcement in *Heninger v. Charnes,* 200 Colo. 194, 613 P.2d 884, 886 n. 3 (1980), that article II, section 25 of the Colorado Constitution implicitly guarantees equal protection, many discrimination claims were brought under article V, section 25. Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 132 (2002). Despite the concern with class composition, article V, section 25 is "more than a redundant equal protection clause." *In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005,* 814 P.2d 875, 886 (Colo.1991)(hereinafter "*Interrogatory* "). The ban on special legislation was also intended to curb favoritism on the part of the General Assembly, prevent the state government from interfering with local affairs, and preclude the legislature from passing unnec-

essary laws to fit limited circumstances. *See* Oesterle & Collins, *supra,* at 132; Citizen's Assembly on the State Constitution, *The Colorado Constitution: Is it Adequate for the Next Century?* 14 (1976). The provision creates a strong preference for the enactment of general legislation. Most importantly, the provision acts as a limitation on the power of the legislature. *See In re Senate Bill No. 95 of the Forty–Third General Assembly of the State of Colorado,* 146 Colo. 233, 239–40, 361 P.2d 350, 354 (1961) ("The limitations upon the power entrusted to those in positions of authority cannot be brushed aside as having no application to projects or enterprises considered by those in official positions, as desirable or necessary to serve a special and local purpose.")(hereinafter *"Senate Bill No. 95 "*).

Since the adoption of the state constitution, we have only rarely held that a statute violated article V, section 25. *See People v. Sprengel,* 176 Colo. 277, 279, 490 P.2d 65, 67 (1971); *Senate Bill No. 95,* 146 Colo. at 238, 361 P.2d at 353; *In re Senate Bill No. 9,* 26 Colo. 136, 139, 56 P. 173, 174 (1899). Section 18–1.4–102(1)(e) bears the characteristics of those unusual statutes we have held to be special legislation.

 Modern approaches to the analysis of whether a statute amounts to special legislation differ depending on whether one of the express prohibitions enumerated in the constitutional provision is implicated. *See Interrogatory,* 814 P.2d at 886. When the statute addresses an enumerated prohibition, we must first answer a threshold question of "whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory." *Id.* If the class created by the legislation is illusory, it is prohibited special legislation. *Id.; see also Senate Bill No. 95,* 146 Colo. at 233, 361 P.2d at 350. Once it is determined that the legislation affects a genuine class, we then address whether the classification is reasonable. *Interrogatory,* 814 P.2d at 886. Where an enumerated prohibition is not implicated, we are unconcerned with the composition of the class "so long as the legislature has not abused its discretion." *Id.,* citing

*Morgan County Junior College Dist. v. Jolly,* 168 Colo. 466, 471, 452 P.2d 34, 36–37 (1969).

We first consider whether the statute addresses one of the prohibited categories listed in the constitutional provision. Several of the explicit prohibitions relate to court proceedings. For example, the first enumerated prohibition prevents the legislature from enacting a statute to grant a divorce to specific persons. Two of the enumerated prohibitions are relevant to the case now before us. One clause prohibits special legislation "regulating the practice in the courts of justice." Another clause prohibits the legislature from enacting special legislation summoning or impaneling petit (i.e., trial) juries.

Section 18–1.4–102(1)(e) involves two of the enumerated prohibitions. First, it regulates the practice in the courts of justice by directing that two specific capital cases be handled in a specific manner. Second, it involves the summoning and impaneling of new juries for these two cases. Both cases were tried to juries and the juries were discharged after returning guilty verdicts. The legislation would require summoning and impaneling a new jury in each case so that the new jury could determine the appropriate sentence. Because the section comes within at least one enumerated prohibition, we next address the question of whether the statute creates a real or illusory class.

In one of the earliest cases applying article V, section 25, we determined that the statute at issue was not special legislation because it was written generally and was "unlimited as to time in its operation." *Darrow v. People ex. rel Norris,* 8 Colo. 417, 418, 8 P. 661, 662 (1885). The statute created a superior court in any city or town containing more than 25,000 inhabitants. *Id.* Although at the time of the case the statute only applied to Denver, the court noted that "there is nothing unreasonable in the supposition that other towns and cities within the state will eventually contain 25,000 inhabitants." *Id.* Because the statute had no time limit and would equally apply to those towns as well, the class was genuine, and the court rejected the argument that the legislation was prohibited special legislation. *Id.*

Later decisions have followed the reasoning in *Darrow* in determining that statutes challenged as special legislation create a genuine class. In *Interrogatory*, we held that a bill designed to provide incentives to United Airlines to build a maintenance facility in Colorado was not special legislation. 814 P.2d at 888. Like the statute in *Darrow*, the bill contained no time limit, and had no provisions that necessarily limited the benefits provided by the bill to United Airlines. *Id.* at 887. Because of these features, it could not be said that "no entity other than United Airlines will *ever* meet the statutory criteria set forth in H.B. 1005." *Id.* (emphasis added). Consequently, we concluded that the class created by the statute was "not so logically and factually restricted that it amount[ed] to an illusory class of one," and was not unconstitutional. *Id.*

Potential future applicability again persuaded us to hold that a statute which only applied to two stream systems at the time of the case was general, and did not constitute special legislation, in *American Water Development, Inc. v. City of Alamosa*, 874 P.2d 352, 371 (Colo.1994)(hereinafter *"AWDI"*). We explained

> Like the legislation at issue in *Darrow*, the natural surface stream legislation has an indefinite period of application. Analogous to *Darrow*, there is nothing unreasonable in the supposition that with the development and refinement of knowledge of geography and hydrology of the state, it may be learned that there are other stream systems that arise as natural surface streams and terminate in Colorado. Therefore, in the future, this legislation may be found to apply to such other streams.

*Id.*

More recently, we relied on the logic of all three of these cases to decide that a statute regarding municipal annexation proceedings was not special legislation. *City of Greenwood Village v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427, 440–44 (Colo. 2000). We observed that although a dispute between two particular cities "clearly affected the timing and enactment of the 1999 Act," the legislation was "generic in its application" and "applicable to other foreseeable situations." *Id.* at 442. A genuine class had therefore been created by the legislation, and "thus passes constitutional muster under [a]rticle V, section 25." *Id.* Our special legislation precedent illustrates that, even when the legislature had a specific entity in mind when drafting the legislation, the class created by the legislation is not illusory if it could include other members in the future.

By contrast, a class that is drawn so that it will never have any members other than those targeted by the legislation is illusory, and the legislation creating such a class is unconstitutional special legislation. *Senate Bill No. 95*, 146 Colo. at 239, 361 P.2d at 354. We found a bill annexing the town of Glendale into the City and County of Denver to be special legislation because it created such an illusory class. *Id.* Although the language of the bill was general, it contained a clause that would provide for its automatic repeal shortly after its enactment. *Id.* This time limitation "made absolutely certain that the bill can apply only to a town now in existence and meeting the very special requirements" incorporated in the bill. *Id.* The bill also could not "operate prospectively because it is impossible that before July 1, 1962, any circumstance can occur to allow another town" to fit its requirements. We remarked that

> Senate Bill No. 95 was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area, to-wit, Glendale. Once having accomplished that particular purpose the act would die before it could possibly accomplish a like purpose in any other place.

*Id.* We reasoned that such legislation was "exactly what the constitution forbids in plain language." *Id.*

The above description of Senate Bill No. 95 could apply equally to section 18–1.4–102(1)(e). The General Assembly convened for only four days, from July 8, 2002, through July 11, 2002. The statute at issue became effective on the next day July 12, 2002, when it was approved by the Governor. During that brief period, the section was "conceived, cut and tailored" to accomplish the purpose of ensuring that the death penalty was avail-

able for Canister and Hagos. Although, unlike the proponents of the legislation at issue in *Senate Bill No. 95,* the 2002 legislature did not refer to Canister and Hagos by name during debate, there were no other individuals who could fit within the requirements of section 18–1.4–102(e).[9] As of July 12, 2002, the date the statutory class created by section 18–1.4–102(1)(e) closed, as well as the date the statute became effective, Canister and Hagos were the only two people in Colorado for whom the prosecution had announced it was seeking the death sentence, who had been convicted at trial of a class 1 felony, and for whom a sentencing hearing had not yet been held. The precise drafting of section 18–1.4–102(1)(e) leaves no doubt as to the identity of the· individuals to whom it was intended to apply.

Because of the time limitation built into the section, Canister and Hagos are the only two people to whom it will ever apply. Like the legislation in *Senate Bill No. 95,* section 18–1.4–102(1)(e) cannot operate prospectively, and will have no future effect after accomplishing its purpose of making the death penalty available as a punishment for Canister and Hagos. In contrast to the potential future applicability of the statute in *Interrogatory,* it is absolutely certain that no one, other than Canister and Hagos, will *ever* meet the statutory criteria set forth in section 18–1.4–102(1)(e). Contrary to the statutes in *Darrow* and *AWDI,* it is impossible that, before July 12, 2002, another defendant will be convicted of a class 1 felony, but not sentenced, in a case where the prosecution has announced it is seeking the death penalty. Here, the statutory category was closed at the same time the statute became effective, and only Canister and Hagos were in it.

Section 18–1.4–102(1)(e) does not contain the features that saved other statutes with readily identifiable targets from violating the prohibition against special legislation. The general language used does not disguise the fact that the section was designed to solely apply to two people. *See Senate Bill No. 95,* 146 Colo. at 239, 361 P.2d at 354 (dismissing the "thin veneer of language used to 'get around' the constitutional prohibition, and to give the measure a mask of general application"); *Senate Bill No. 9,* 26 Colo. at 138, 56 P. at 174 (general character of school charter bill irrelevant because "the legislature could not by law directly provide that specified school districts, organized under the general laws of the state, should be consolidated with one existing under a special charter; and what it is prohibited from doing directly it cannot do indirectly."). Because those two people are the only individuals to whom the statute will ever apply, the classification adopted by the legislature is logically and factually limited to a "class of one," and thus is illusory. An illusory classification is not rational, and the section violates the constitutional prohibition against special legislation. No matter how abhorrent the crimes that Canister committed are, the legislature cannot single him out for special punishment.

Accordingly, the prosecution cannot seek the death penalty against Canister under section 18–1.4–102(1)(e). Moreover, the three-judge capital sentencing procedure in place at the time of Canister's crimes and convictions cannot be applied to him because it is unconstitutional under the Sixth Amendment right to a jury trial. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428; *Woldt,* 64 P.3d at 259. As a result, the only sentence constitutionally available for Canister is a life sentence without the possibility of parole. *See* § 18–1.3–401(4), C.R.S. (2004) (providing that "a person who has been convicted of a class 1 felony shall be punished by life imprisonment in the department of corrections unless a proceeding held to determine sentence ...

---

**9.** In *Senate Bill No. 95,* we took judicial notice of the fact that the bill was known by all interested parties as "the Glendale Bill." Although similar references were · not made regarding Canister and Hagos, David Kaplan, Colorado State Public Defender, did alert the legislature to the problem of special legislation. He testified before the House Criminal Justice Committee that the bill under consideration "specifically addresses two other individuals who are in various stages of the death penalty cases as we speak and sit here today ... So far as this bill tries to address those specific people I think that they will have some constitutional problems." *Hearing on HB 02S–1005 Before the House Criminal Justice Committee,* 63rd Gen. Assemb., 3rd Extraordinary Sess. (Colo. July 8, 2002)(statement of David Kaplan, Colorado State Public Defender).

results in a verdict that requires imposition of the death penalty").

Canister also raised arguments challenging the constitutionality of section 18–1.4–102(1)(e) under state and federal constitutional prohibitions against bills of attainder and ex post facto laws, as well as claiming the section violated due process. Because we have decided that the section is unconstitutional special legislation, we do not reach the remaining arguments.

## IV. Conclusion

We hold that section 18–1.4–102(1)(e) is special legislation in violation of article V, section 25 of the Colorado Constitution. Consequently, the prosecution may not seek imposition of the death penalty against Canister under that statute, or any other Colorado statute. We therefore uphold the ruling of the trial court and remand for imposition of a life sentence without the possibility of parole.

Justice COATS, dissenting.

Because I believe the majority wrongly characterizes section 18–1.4–102(1)(e) as special legislation and therefore erroneously strikes it down as prohibited by article V, section 25 of the state constitution, I respectfully dissent. Because I am, however, even more disturbed by the majority's willingness to by-pass the well-established ex post facto analyses of both the federal and state constitutions (which I believe would require it to reach the opposite result), and instead discover, in an obscure provision of the state constitution, a never-before recognized limitation on the power of the legislature to apply its acts retroactively, I feel compelled briefly to articulate my concerns.

Like a number of other states entering the Union before the twentieth century, Colorado included in its constitution various provisions resolving contemporaneous debates about the reach of the legislative power, in particular areas of the law, and limiting favoritism by the general assembly. See Dale A. Oesterle & Richard B. Collins, *The Colorado State constitution: A Reference Guide* 132 (2002); Walter Carrington, 1 *Cooley's Constitutional Limitations* 258 n. 8 (8th ed.1927). Article V, Section 25 bars special legislation in 23 separate categories,[1] often overlapping with other similarly motivated provisions, *see, e.g.,* Art. II, Section 11 (forbidding special privileges, franchises or immunities); and it prohibits special laws in any case in which a general law can be made applicable. While the term is not constitutionally defined, special laws have generally been understood to include not only those laws relating to particular persons, entities, places, or things by name, but also laws relating to persons, entities, places, or things, even if not particularized by name, numbering fewer than the entire class of those similarly situated. Determining whether a law is special, despite not naming a particular individual or entity, has therefore been acknowledged to turn on the question whether the classification it creates is reasonable, or whether it is instead purely arbitrary, artificial, illusory, or fictitious.

As the majority concedes, under these standards, acts of the general assembly have almost never in the history of the state been struck down as special laws, and particularly not since the modern development of the equal protection clause. In 1899, this court disapproved a proposed bill, whose "sole purpose and object" was concededly to permit four specific school districts, partly within the City of Denver, to join with the city's

1. With regard to the granting of divorces, for example, the first of the specifically enumerated limitations of art. V, sec. 25, Cooley notes:

The granting of divorces from the bonds of matrimony was not confided to the courts in England, and from the earliest days the Colonial and State legislatures in this country have assumed to possess the same power over the subject which was possessed by the Parliament, and from time to time they have passed special laws declaring a dissolution of the bonds of matrimony in special cases. Now it

is clear that the question of divorce involves investigations which are properly of a judicial nature and the jurisdiction over divorces ought to be confined exclusively to the judicial tribunals, under the limitations to be prescribed by law, and so strong is the general conviction of this fact, that the people in framing their constitutions, in a majority of the States, have positively forbidden any such special laws. Carrington, *supra,* at 208 (internal quotations and citations omitted).

school district, in the absence of any other reason to single them out for treatment different from other districts also governed by the general school law of the state. *See In re Senate Bill No. 9*, 26 Colo. 136, 56 P. 173 (1899). Again in 1961, this court disapproved a bill providing for Denver's annexation of Glendale, without naming it, finding among other things that "[t]here [was] no conceivable reason for differentiation to be made between a 640–acre surrounded town and a 640–acre surrounded city." *See In re Senate Bill No. 95 of the Forty–Third General Assembly of the State of Colorado*, 146 Colo. 233, 238, 361 P.2d 350, 353 (1961). And finally in 1971, in what might be considered a third reliance on the provision, this court upheld a trial court finding that a statute imposing a burden on motel, but not hotel, signage violated Art. V, Sec. 25, but it did so solely on the ground that the statute violated the Fourteenth Amendment Equal Protection Clause. *People v. Sprengel*, 176 Colo. 277, 490 P.2d 65 (1971).

By contrast with those three cases, the class distinction affecting the defendant in this case is not only rational; it is also dictated by historical circumstance rather than legislative choice. The general assembly did not single this class out by design. It merely made clear its intent that capital defendants who had already been convicted, but not yet sentenced, when the United States Supreme Court abruptly overturned its own decision in *Walton v. Arizona*,[2] be sentenced by a jury rather than the court, like capital defendants not yet placed in jeopardy. Although defendants who had already been convicted could not, as a practical matter, be sentenced by the same jury that found them guilty, the Supreme Court has never required as much; and it was certainly possible, as a practical matter, to require the state to demonstrate aggravation, and permit those defendants to present any relevant mitigation, to a new jury, in lieu of the sentencing windfall now ordered by the majority. Rather than addressing the reasonableness of this class distinction in light of the historical circumstances, however, the majority simply finds

the class to be "illusory," for the sole reason that it can never expand beyond its current membership of two.

On a number of occasions, we have disregarded the limited size of a class to which particular legislation applied, noting among other reasons that the affected class had the capacity to grow; and on one occasion, we struck down a law as special legislation because the general assembly crafted it so narrowly and arbitrarily, in part by artificially cutting off the ability of the affected class to expand in the future, that it could never apply to more than one situation—the annexation of Glendale by Denver. See *In re Senate Bill No. 95*, 146 Colo. 233, 361 P.2d 350. We have never before suggested, however, that the inability of a statute ever to affect more than a small class renders the classification illusory or renders the law special legislation. The circumstances of the current statute are enough to expose the inappropriateness of such a proposition.

Membership in the class that includes the defendant in this case is not limited by legislative design but by historical and constitutional necessity. Rather than artificially limit the class to a predetermined individual, the legislature clearly sought to apply the mandate of the Supreme Court as broadly as factually possible and constitutionally permissible. Whether it is constitutionally permissible to apply this new sentencing statute backward in time, to include defendants who have already been found guilty by a jury of a capital offense, clearly turns on the scope of the constitutional prohibition against ex post facto laws. The majority, however, avoids this analysis by creating a new constitutional limitation (under the rubric of "special legislation"), barring the legislature from applying its laws to any class that has already "closed" if, as fate would have it, the number of individuals actually falling within the class turns out to be small. Whether it is constitutionally permissible to provide a benefit to, or impose a burden upon, such a class will always warrant further analysis; but whether

**2.** 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), overruled by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

the class is illusory, simply because, as a factual matter, it will remain forever small, cannot be the subject of serious debate.

A substantial body of case law has been developed, by both this court and the United States Supreme Court, concerning the applicability of capital sentencing procedures to offenses committed before their adoption. *See, e.g., Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *People v. Dist. Court,* 834 P.2d 181 (Colo.1992). While I strongly believe the principles established in those analyses would sanction the legislative action at issue here, I am even more convinced that they provide the relevant framework for analysis. I therefore find of particular concern the majority's decision to by-pass this established body of thought and law (upon which the legislature clearly relied), and to rest its holding on a new and novel construction of an undeveloped provision of the state constitution, which was clearly not designed for (and has never before been thought to apply to) the analysis of retroactivity in capital sentencing.

It is always tempting for courts to circumvent long years of analysis and construction that have preceded them, by subtly altering the framework of analysis. Particularly when the change occurs as a sudden break from the past, rather than as a natural and incremental stream of development, the judiciary is understandably subject to criticism for rewriting constitutional limitations on the power of the legislature. The judiciary, no less than the legislature, is bound by case law that defines the relationship between the two branches.

Because I am extremely apprehensive about the implications of expanding the meaning of "special legislation," as I believe the majority has done today; and because I would uphold the constitutionality of the statute at issue in this case, under what I believe to be the appropriate constitutional analysis, I respectfully dissent.

I am authorized to say Justice KOURLIS joins in this dissent.