Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 17, 2018

**2018 CO 77**

**No. 18SA90, <u>People v. Brooks</u>—Special Legislation Clause—Sentencing—Felony
Murder—Juvenile Sentencing.**

This case requires the supreme court to determine whether Colorado's recently
enacted sentencing scheme for juvenile offenders who received unconstitutional
mandatory sentences to life in prison without the possibility of parole ("LWOP")
violates the Special Legislation Clause of the Colorado Constitution.

The court assumes without deciding that the revised sentencing scheme, which
the General Assembly enacted in response to Untied States Supreme Court cases
deeming unconstitutional mandatory LWOP sentences for juvenile offenders, is subject
to the Special Legislation Clause and implicates one of the provisions enumerated
therein.  The court then concludes that the revised sentencing scheme does not run
afoul of the Colorado Constitution's prohibition of special legislation because the
statute creates a genuine class and its legislative classifications are reasonable.  In so
concluding, the court rejects the People's contentions that the class must be deemed
illusory because it is "closed" and that the class is, in fact, closed to future members.

Accordingly, the supreme court discharges the rule to show cause.

**2018 CO 77**

**Supreme Court Case No. 18SA90**
*Original Proceeding Pursuant to C.A.R. 21*
Arapahoe County District Court Case No. 95CR675
Honorable Carlos A. Samour, Jr., Judge

**In Re**
**Plaintiff:**

The People of the State of Colorado,

v.

**Defendant:**

Curtis A. Brooks.

**Rule Discharged**
*en banc*
September 17, 2018

**Attorneys for Plaintiff:**
George H. Brauchler, District Attorney, Eighteenth Judicial District
Susan J. Trout, Senior Deputy District Attorney
       *Centennial, Colorado*

**Attorneys for Defendant:**
Connelly Law, LLC
Sean Connelly
       *Denver, Colorado*

Eytan Nielsen LLC
Dru Nielsen
        *Denver, Colorado*


Ratliff Law Firm LLC
Ashley Ratliff
        *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Constitutional, Criminal, and Juvenile Law Scholars:**
Christopher N. Lasch
Ian Farrell
        *Denver, Colorado*

**Attorneys for Amicus Curiae Denver District Attorney:**
Beth McCann, Denver District Attorney, Second Judicial District
Robert M. Russel, Senior Chief Deputy District Attorney
        *Denver, Colorado*

**Attorneys for Amici Curiae District Attorneys for the First, Fourth, and Nineteenth Judicial Districts:**
Peter Weir, District Attorney, First Judicial District
Donna Skinner Reed, Chief Appellate Deputy District Attorney
        *Golden, Colorado*

Daniel H. May, District Attorney, Fourth Judicial District
Doyle Baker, Senior Deputy District Attorney
        *Colorado Springs, Colorado*

Michael J. Rourke, District Attorney, Nineteenth Judicial District
        *Greeley, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**CHIEF JUSTICE COATS** concurs in the judgment and **JUSTICE MÁRQUEZ** joins the concurrence.
**JUSTICE SAMOUR** does not participate.

¶1     This case presents the question of whether Colorado's recently enacted sentencing scheme for juvenile offenders who received unconstitutional mandatory sentences to life in prison without the possibility of parole ("LWOP") violates the Special Legislation Clause of the Colorado Constitution. We conclude that it does not.

¶2     Based on acts that Brooks committed when he was fifteen years old, prosecutors charged Brooks as an adult with felony murder and other crimes. After a jury convicted Brooks on multiple counts, including the felony murder charge, the trial court imposed a mandatory LWOP sentence in accordance with Colorado's then-applicable sentencing statutes.

¶3     Over fifteen years later, the United States Supreme Court decided Miller v. Alabama, 567 U.S. 460 (2012), and Montgomery v. Louisiana, 136 S. Ct. 718 (2016), which, respectively, deemed mandatory LWOP sentences for those who were under eighteen at the time of their crimes unconstitutional and concluded that Miller announced a new substantive constitutional rule that was to be applied retroactively on state collateral review. In response to these rulings, the General Assembly amended the pertinent sentencing statutes to provide for resentencing of people, like Brooks, who were then serving unconstitutional mandatory LWOP sentences.

¶4     Under the General Assembly's revised sentencing scheme, most persons serving unconstitutional sentences for class 1 felonies would be resentenced to a term of life imprisonment with the possibility of parole after forty years. See § 18-1.3-401(4)(c)(I), C.R.S. (2018). A juvenile who had received a mandatory LWOP sentence after

3

conviction for felony murder, however, could request a resentencing hearing before the district court. If, based on the evidence presented at this hearing, the district court found extraordinary mitigating circumstances, then the court could resentence the defendant to a determinate sentence of thirty to fifty years in prison. See § 18-1.3-401(4)(c)(I)(A).

¶5 In accordance with these procedures, Brooks petitioned the district court to resentence him to a determinate term of thirty years in prison, over twenty of which he had already served, with ten years of mandatory parole. The People opposed this motion, arguing that the General Assembly's revisions to the sentencing scheme violated the Colorado Constitution's Special Legislation Clause by granting to the small group of people serving unconstitutional sentences for felony murder special privileges (namely, the resentencing hearing and the potential for a thirty- to fifty-year determinate sentence) that were unavailable to the larger class of people serving unconstitutional sentences.

¶6 The district court ultimately concluded that the People had not carried their burden of demonstrating that the revised sentencing scheme violated the Special Legislation Clause. The People then petitioned this court for a rule to show cause why the district court's order should not be vacated, and we granted that petition.

¶7 We now discharge the rule. Assuming without deciding that the revised sentencing scheme is subject to the Special Legislation Clause and implicates one of the provisions enumerated therein, we conclude that the sentencing scheme does not run

4

afoul of the constitution's prohibition of special legislation because the statute creates a genuine class and its legislative classifications are reasonable. In so concluding, we reject the People's contentions that the class must be deemed illusory because it is "closed" and that the class is, in fact, closed to future members.

¶8 Accordingly, we agree with the district court's conclusion that the Special Legislation Clause does not invalidate the revised sentencing legislation, although our reasoning differs from that court's analysis in several respects. We therefore discharge the rule to show cause.

## I. Facts and Procedural History

¶9 In 1997, a jury convicted Brooks for, among other things, a felony murder committed in 1995 when he was fifteen years old. Brooks had been tried as an adult, and pursuant to the sentencing laws in effect at the time, the court sentenced him to a mandatory LWOP term. Brooks began serving this sentence in 1997, and he remains in prison today.

¶10 In 2012, the United States Supreme Court decided Miller, 567 U.S. at 465, in which it held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" Montgomery, 136 S. Ct. at 732, decided four years later, clarified that Miller had announced a substantive rule that should be applied retroactively in cases on collateral review.

¶11    Taken together, these two cases effectively invalidated the sentence that Brooks had received, along with the sentences of approximately fifty other persons in Colorado who had been convicted of class 1 felonies committed on or after July 1, 1990 and before July 1, 2006 when they were juveniles. Colorado statutory law, however, did not provide any alternative constitutional sentences for these offenders.

¶12    The gap that Miller and Montgomery left in Colorado's sentencing scheme thus cried out for a legislative solution. See People v. Tate, 2015 CO 42, ¶ 47, 352 P.3d 959, 969-70 (attempting, in the absence of an applicable constitutional sentence adopted by the legislature, to deduce the sentence that the legislature would have adopted had it anticipated the ruling in Miller). In 2016, the General Assembly responded and amended Colorado's sentencing scheme to provide for the resentencing of those persons whose sentences had been rendered unconstitutional by Miller and Montgomery. The revised legislation (the "2016 sentencing legislation") provides, in pertinent part:

> (c)(I) . . . [A]s to a person who is convicted as an adult of a class 1 felony following a direct filing of an information or indictment in the district court pursuant to section 19-2-517, C.R.S., or transfer of proceedings to the district court pursuant to section 19-2-518, C.R.S., or pursuant to either of these sections as they existed prior to their repeal and reenactment, with amendments, by House Bill 96-1005, which felony was committed on or after July 1, 1990, and before July 1, 2006, and who received a sentence to life imprisonment without the possibility of parole:
>
> (A) If the felony for which the person was convicted is murder in the first degree, as described in section 18-3-102(1)(b) [i.e., felony murder], then the district court, after holding a hearing, may sentence the person to a determinate sentence within the range of thirty to fifty years in prison, less any earned time granted pursuant to section 17-22.5-405, C.R.S., if, after

6

considering the factors described in subparagraph (II) of this paragraph (c), the district court finds extraordinary mitigating circumstances. Alternatively, the court may sentence the person to a term of life imprisonment with the possibility of parole after serving forty years, less any earned time granted pursuant to section 17-22.5-405, C.R.S.

(B) If the felony for which the person was convicted is not murder in the first degree, as described in section 18-3-102(1)(b) [i.e., if it is a form of first degree murder other than felony murder], then the district court shall sentence the person to a term of life imprisonment with the possibility of parole after serving forty years, less any earned time granted pursuant to section 17-22.5-405, C.R.S.

§ 18-1.3-401(4)(c)(I).

¶13 The 2016 sentencing legislation thus divides the fifty people serving unconstitutional sentences in Colorado into two groups. The first group comprises those serving mandatory LWOP sentences for felony murders that they committed when they were juveniles. Although the parties dispute the exact number of people in this group, they appear to agree that the group numbers at least sixteen people, and for convenience, we will therefore refer to this group as the "class of sixteen." Under the 2016 sentencing legislation, this group could be sentenced either to a determinate sentence of thirty to fifty years (if the court finds, after a hearing, extraordinary mitigating circumstances) or to a term of life imprisonment with the possibility of parole after forty years. The second group comprises those serving mandatory LWOP sentences for class 1 felonies other than felony murder that they committed when they were juveniles. Under the 2016 sentencing legislation, members of this second group must be sentenced to a term of life imprisonment with the possibility of parole after

7

forty years. The members of this group do not qualify for a hearing before the district court on mitigating circumstances or for a determinate sentence of thirty to fifty years.

¶14     Brooks falls within the first group, and as pertinent here, he sought to invoke the district court's discretion to reduce his sentence to a term of thirty years in prison with ten years of mandatory parole. The People opposed Brooks's motion, arguing that the provisions of the 2016 sentencing legislation allowing the first group to receive a determinate sentence of thirty to fifty years are unconstitutional under the Special Legislation Clause, article V, section 25 of the Colorado Constitution. Specifically, the People contend that the sentencing provisions applicable to the first group create a special class of sixteen persons entitled to the exclusive privilege of a thirty- to fifty-year prison term. According to the People, the Special Legislation Clause, which forbids the passage of local or special laws in certain circumstances, prohibits this sort of favoritism for a few.

¶15     The district court initially agreed with the People and concluded that the pertinent portions of the 2016 sentencing legislation violated the Special Legislation Clause. On reconsideration, however, the court reversed itself and found that the People had not carried their burden of proving that the challenged provisions are unconstitutional. Accordingly, the district court determined that Brooks qualified for a hearing to determine his eligibility for a determinate sentence of between thirty and fifty years with ten years of mandatory parole.

¶16 Shortly before this resentencing hearing could occur, the People petitioned this court for a rule to show cause why the district court's final order upholding the constitutionality of the 2016 sentencing legislation should not be vacated. We issued the rule to show cause, this matter has now been fully briefed, and we have heard oral argument in this case.

## II. Analysis

¶17 We begin by discussing our jurisdiction to hear this matter. We then proceed to discuss the Special Legislation Clause, and we apply our precedent concerning that clause to the facts of this case.

## A. C.A.R. 21

¶18 An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited both in its purpose and availability. Ferrer v. Okbamicael, 2017 CO 14M, ¶ 17, 390 P.3d 836, 841. The exercise of our original jurisdiction under C.A.R. 21 is discretionary. Id. We have generally exercised jurisdiction under C.A.R. 21 "in cases that raise issues of first impression and are of significant public importance." Id.

¶19 This court has not yet addressed the applicability of the Special Legislation Clause to the 2016 sentencing legislation, and a significant number of cases pending throughout Colorado implicate this issue. Accordingly, we believe that the exercise of our original jurisdiction under C.A.R. 21 is warranted and appropriate here.

## B. The Special Legislation Clause

¶20 Article V, section 25 of the Colorado Constitution prohibits the General Assembly from "pass[ing] local or special laws" in a number of "enumerated cases,"

9

including, for example, "granting divorces," "regulating county or township affairs," "regulating the practice in courts of justice," and "granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever." The section further provides, "In all other cases, where a general law can be made applicable no special law shall be enacted." Id.

¶21    The Special Legislation Clause was enacted, in part, to prevent legislation that applies to some classes but not others without a reasonable basis for distinguishing them. People v. Canister, 110 P.3d 380, 382 (Colo. 2005). This provision, however, is not merely a redundant equal protection clause. Id. It "was also intended to curb favoritism on the part of the General Assembly, prevent the state government from interfering with local affairs, and preclude the legislature from passing unnecessary laws to fit limited circumstances." Id. at 382–83. Since the adoption of our state constitution, we have only rarely concluded that a statute violated the Special Legislation Clause. Id. at 383.

¶22    Modern approaches to the question of whether a statute amounts to prohibited special legislation differ depending on whether the challenged legislation implicates one of article V, section 25's enumerated cases. See id.

¶23    If the challenged legislation addresses an enumerated case, then we first answer "a threshold question of 'whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory.'" Id. (quoting In re Interrogatory Propounded by Governor Roy Romer

10

on House Bill 91S-1005, 814 P.2d 875, 886 (Colo. 1991)). If the class created by the challenged legislation is "illusory," then the legislation will be deemed prohibited special legislation. Id. Once it is determined that the legislation affects a "genuine" class, however, we address whether the classification is reasonable. See id.

¶24  If the challenged legislation does not implicate an enumerated case, then "we are unconcerned with the composition of the class 'so long as the legislature has not abused its discretion.'" Id. (quoting Interrogatory, 814 P.2d at 886).

¶25  Here, the People argue that the 2016 sentencing legislation implicates two enumerated cases, namely, (1) "regulating the practice in courts of justice" and (2) "granting to any corporation, association or individual any special or exclusive privilege." Assuming without deciding that the legislation at issue here even implicates the Special Legislation Clause,[1] we need not decide whether either of the cases on which the People rely is implicated in this case because even if they were, we conclude that the class created by the legislation is genuine and not illusory and that the classification adopted by the legislature is reasonable. We proceed to explain why this is so.

### 1. The Class at Issue Is Not Illusory

¶26  We have recognized that whether a classification is "logically and factually limited to a class of one and thus illusory" depends on a number of factors, including,

---

[1] In this regard, we acknowledge the issue raised in Justice (now-Chief Justice) Coats's dissent in Canister, 110 P.3d at 386–88 (Coats, J., dissenting), as to whether the Special Legislation Clause is even implicated in a case like this involving curative legislation adopted after prior legislation has been deemed unconstitutional.

but not limited to, (1) the class's size, cf. Interrogatory, 814 P.2d at 886 (noting that if no enumerated case is implicated, then "the size of the class becomes irrelevant so long as the legislature has not abused its discretion"); (2) whether the challenged legislation was limited as to time in its operation, Canister, 110 P.3d at 383–84; (3) the potential future applicability of the legislation, see id. at 384; and (4) the extent to which the legislation appears to have "single[d] out" or "targeted" the class for special treatment, see id. at 384-85 ("No matter how abhorrent the crimes that Canister committed are, the legislature cannot single him out for special punishment."); Vitetta v. Corrigan, 240 P.3d 322, 328 (Colo. App. 2009) ("[The Special Legislation Clause] bars laws targeted at specific parties and incapable of more general application."). We address each of these factors in turn.

¶27 With respect to the class's size, although our opinion in Interrogatory referred to a "class of one" as illusory, Interrogatory, 814 P.2d at 886, we have recognized that classes composed of more than one member also can be illusory, see, e.g., Canister, 110 P.3d at 385 (invalidating legislation "designed to solely apply to two people"). We have never held that a class as large as sixteen was illusory, however, and the class's size here thus militates against an invalidation of the 2016 sentencing legislation as unconstitutional special legislation.

¶28 With respect to any time limitation, we note that the 2016 sentencing legislation, although directed to juveniles who committed class 1 felonies in a certain time frame, is unlimited as to time in its operation. Cf. In re Senate Bill No. 95, 361 P.2d 350, 354

12

(Colo. 1961) (noting that the legislation at issue contained a date on which it would be repealed and therefore, once it had accomplished the particular purpose for which it was adopted, it "would die before it could possibly accomplish a like purpose in any other place"). Accordingly, this factor, too, suggests that the class at issue is genuine. See Canister, 110 P.3d at 383–84.

¶29 Related to the question of whether the 2016 sentencing legislation contains any time limitation, we also consider the "potential future applicability" of that legislation. Specifically, we look to whether the class is "drawn so that it will never have any members other than those targeted by the legislation." Canister, 110 P.3d at 384. Here, although the People contend that the class of sixteen can never include any other members, we disagree.

¶30 As Brooks contends, the 2016 sentencing legislation, and specifically section 18-1.3-401(4)(c)(I)(A), could conceivably apply to a "cold case," that is, a case in which a now-unknown person is convicted and sentenced in the future for a felony murder committed on or after July 1, 1990 and before July 1, 2006 when that person was a juvenile. Although the People argue that contrary to the eligibility requirements of section 18-1.3-401(4)(c)(I), this person will never be convicted or sentenced during the time period of July 1, 1990 to July 1, 2006 and therefore could never have received a mandatory LWOP sentence or be eligible for consideration under the revised statute, we are not persuaded.

13

¶31 The People's argument appears to be premised on the view that the juvenile must be convicted or sentenced on or after July 1, 1990 and before July 1, 2006, but that is not what the statute says. It concerns persons convicted as adults of a class 1 felony, which felony was <u>committed</u> in the above-noted time frame and who received a mandatory LWOP sentence upon conviction of that crime. <u>See</u> <u>id.</u> Accordingly, the statute requires only that the offense be <u>committed</u> in the referenced time frame. It does not require that either the conviction be entered or the sentence be received in that time frame.

¶32 Moreover, under the People's interpretation, if a future cold case defendant were to be convicted of a felony murder that he or she committed as a juvenile on or after July 1, 1990 and before July 1, 2006, then no constitutional sentence created by the legislature would apply. The law in effect at the time an offense is committed generally controls the sentence to be imposed for that offense. <u>People v. Cali</u>, 2018 COA 61, ¶ 8, ___ P.3d ___. The sentencing law in effect in the above-referenced time frame, however, which dictated a mandatory LWOP term for felony murders committed by juveniles during that period, has now been declared unconstitutional. Moreover, prior to the 2016 sentencing legislation, the legislature had not provided for any other applicable sentence. Accordingly, if the People were correct, then, as occurred in <u>Tate</u>, 352 P.3d at 970, the courts, rather than the legislature, would be tasked with filling the legislative gap. We do not agree that this should be the preferred mechanism for deciding the question of legislative prerogative at issue. Even if it were, however, applying the

14

reasoning in <u>Tate</u>, in which we asked "what the legislature would have imposed" had it known that its sentencing scheme would be invalidated, <u>id.</u>, we would likely look to section 18-1.3-401(4)(c)(I)(A) as the best indication of what the legislature would have done.

¶33 In addition to the possibility of a cold case defendant, as amicus curiae the Denver District Attorney posits, the class of sixteen could also potentially expand by way of a post-conviction challenge. For example, a juvenile might have been charged as an adult and convicted of both murder after deliberation and felony murder for acts committed on or after July 1, 1990 and before July 1, 2006. Had this occurred, the trial court could have entered judgment either on a generic count of murder or on a single count of murder after deliberation and then sentenced the juvenile to a mandatory LWOP term. The juvenile could then, however, initiate and prevail in a post-conviction proceeding seeking to invalidate his or her prior conviction, and a post-conviction order in favor of the juvenile might result in an amended judgment reflecting a conviction for felony murder. <u>See</u> Crim. P. 35(c)(3)(V) ("If the court finds that defendant is entitled to postconviction relief, the court shall make such orders as may appear appropriate to restore a right which was violated, such as vacating and setting aside the judgment, imposing a new sentence, granting a new trial, or discharging the defendant."). Were this to occur, the class of sixteen would expand.

¶34 For these reasons, the potential future applicability of the legislation at issue weighs against a conclusion that that legislation violates the Special Legislation Clause.

15

¶35 In reaching this conclusion, we are not persuaded by the People's assertion that section 18-1.3-401(4)(c)(I) would not apply to the juvenile in the above-described post-conviction scenario because the statute applies only to those convicted of a felony murder committed on or after July 1, 1990 and before July 1, 2006 and who received a mandatory LWOP sentence for that conviction. The People contend that this juvenile would never have received a mandatory LWOP sentence for felony murder as required for eligibility under the challenged provision. For several reasons, we disagree.

¶36 First, as set forth above, we perceive nothing in section 18-1.3-401(4)(c)(I) that requires the conviction or sentencing to have occurred on or after July 1, 1990 and before July 1, 2006, as the People appear to presume.

¶37 Second, to the extent that the People's argument hinges on the statute's reference to a person "who received a sentence to life imprisonment without the possibility of parole," § 18-1.3-401(4)(c)(I), the juvenile in our hypothetical post-conviction challenge satisfies this criterion and therefore qualifies for possible determinate sentencing under the statute.

¶38 Lastly, for the reasons set forth above, the People's interpretation would leave trial courts with no constitutional options for sentencing in the above-described post-conviction scenario. We do not believe that the legislature would have intended such a result, nor are we willing to countenance this result in the circumstances presented here.

16

¶39    For these reasons, we reject the People's contention that the 2016 sentencing legislation has no potential future applicability.

¶40    Finally, with respect to whether the 2016 sentencing legislation "single[d] out" or "targeted" a class for special treatment, we have indicated that legislation does so when, for example, a bill was "unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area." In re Senate Bill No. 95, 361 P.2d at 354. In re Senate Bill No. 95 provides a good example of such a bill. In that case, the city of Denver wished to annex the town of Glendale. Id. at 353. After Glendale voters, pursuant to procedures decreed by then-existing law, twice refused by election to be annexed, proponents of the annexation introduced statewide legislation that would have allowed a city that surrounded a certain-sized town for a defined period of time to annex that town by compulsion and without having to obtain the town's approval in an election, as otherwise required by then-existing law. Id. at 351-53. We observed, however, that this legislation could apply only to Denver and Glendale: "We would be blind to stark reality indeed if we assumed the possibility of any other geographical areas in Colorado to which [the statute] would apply, save and except the city of Denver and the town of Glendale." Id. at 353. On these facts, we concluded that the legislation at issue did "exactly what the constitution forbids in plain language." Id. at 354; see also id. (observing that "[t]he thin veneer of language used to 'get around' the constitutional prohibition, and to give the measure a mask of general application, falls from the face of the bill when considered in light of common

17

knowledge of which we take judicial notice."). We thus held that the legislation was a local or special law in violation of the Special Legislation Clause. <u>See id.</u> at 353.

¶41  The circumstances of the present case bear little resemblance to <u>In re Senate Bill No. 95</u>. Here, the legislature did not conceive, cut, or tailor the legislation to accomplish a particular purpose with respect to a particular favored person or entity. Rather, the Supreme Court's decisions in <u>Miller</u> and <u>Montgomery</u> demanded that the legislature act to remedy the unconstitutional sentences issued between 1990 and 2006 and to fill the statutory gap created by those decisions. Nor do we perceive any basis to conclude that in adopting the 2016 sentencing legislation, the legislature employed statutory language to "get around" the special legislation clause. <u>See In re Senate Bill No. 95</u>, 361 P.2d at 354. And the fact that the 2016 sentencing legislation has potential future applicability to unknown class members demonstrates that the legislature neither "singled out" nor "targeted" any particular persons for special treatment. Thus, this last factor, too, weighs against a conclusion that the 2016 sentencing legislation creates an illusory class.

¶42  For these reasons, we conclude that the class created by the 2016 sentencing legislation is genuine and not illusory.

¶43  In so concluding, we are unpersuaded by the People's contention that the class at issue is necessarily illusory because it is "closed." We reject this assertion for three reasons.

¶44  First, for the reasons discussed above, we disagree with the People's premise that the class at issue here is, in fact, closed.

18

¶45   Second, even if the class were arguably closed, our case law in the context of the Special Legislation Clause has not adopted or developed the distinction between "open" and "closed" classes on which the People rely.

¶46   Third, we disagree with the People's contention that every "closed" class is, by definition, illusory. Such an interpretation would amount to a blanket prohibition on the passage of any legislation concerning closed classes in enumerated cases, however large those classes, no matter their composition, and regardless of the nature of the underlying legislation. The People cite no applicable authority to support so drastic a result, and we have seen none. Moreover, adopting the People's reasoning could potentially invalidate a broad swath of legislation previously deemed constitutional. See, e.g., Gates Rubber Co. v. S. Suburban Metro. Recreation & Park Dist., 516 P.2d 436, 437–38 (Colo. 1973) (upholding as constitutional legislation with a grandfather clause exempting a closed class of pre-existing properties in a special district from certain ad valorem taxes because grandfather clauses properly preserve and protect interests existing at the time of a legislative enactment). Absent any applicable authority supporting the People's position, we decline to overturn such settled precedent.

¶47   Accordingly, we conclude that the class at issue is genuine, and we proceed to address the reasonableness of the legislative classification at issue.

## 2. The Classification at Issue Is Reasonable

¶48   When legislation implicates an enumerated case and affects a genuine class, we must uphold the legislation "if we can conceive of any reasonable relation between [the

19

legislation's] legitimate stated purposes and the classifications made." Interrogatory, 814 P.2d at 887; accord Canister, 110 P.3d at 383. "Th[ose] classification[s] must be based on some distinguishing peculiarity and must reasonably relate to the purpose of the statute." Interrogatory, 814 P.2d at 887. As the party challenging the legislation, the People bear the burden of showing that the classification is unreasonable. See Poudre Valley Rural Elec. Ass'n v. City of Loveland, 807 P.2d 547, 553 (Colo. 1991).

¶49 The parties do not appear to dispute that the General Assembly enacted the 2016 sentencing legislation to close the sentencing gap created by the Supreme Court's decisions in Miller and Montgomery. On its face, this constitutes a legitimate legislative purpose. See People v. Deroulet, 48 P.3d 520, 526 (Colo. 2002) (noting the General Assembly's "primacy . . . in crafting sentencing schemes").

¶50 We therefore must consider whether a reasonable relationship exists between the legislature's legitimate purpose and the classifications made. See Interrogatory, 814 P.2d at 887. The 2016 sentencing legislation distinguishes members of the class of sixteen from other juveniles tried as adults for class 1 felonies in two ways: (1) based on the crime of which they were convicted (i.e., felony murder versus other forms of first degree murder) and (2) based on the time of their offense (i.e., committed on or after July 1, 1990 and before July 1, 2006 versus committed at any other time). The People challenge both of these distinctions as unreasonable, and we address them in turn.

¶51 Regarding the distinctions made by the legislature based on the crimes committed, we have said, "It is clearly within the legislature's prerogative to establish

20

the penalties . . . which shall apply to specific criminal offenses." People v. Bramlett, 573 P.2d 94, 97 (Colo. 1977). Consequently, the General Assembly may establish more severe penalties for conduct that it believes has greater social impact and more grave consequences. Smith v. People, 852 P.2d 420, 421 (Colo. 1993).

¶52 As the district court noted, the 2016 sentencing legislation likely reflects a policy judgment that a juvenile's conviction for felony murder may warrant a lesser penalty than a conviction for a different class 1 felony. This policy choice rests squarely with the legislature, and we perceive no basis for deeming it unreasonable here. See Bramlett, 573 P.2d at 97 ("The matter properly lies with the legislature subject to the limits of the constitution.").

¶53 The 2016 sentencing legislation's distinction between offenses committed on or after July 1, 1990 and before July 1, 2006, on the one hand, and those committed at any other time, on the other, is likewise reasonable. This distinction plainly manifests the General Assembly's intent to fill the gap created by Miller and Montgomery's invalidation of the mandatory LWOP sentencing scheme that existed in Colorado during that period. Additionally, as the district court observed, Brooks and other juveniles sentenced for class 1 felonies committed during this period are uniquely situated because, by the time of the district court's opinion, they would have been serving unconstitutional sentences for at least a decade (two decades in Brooks's case). Moreover, throughout these sentences, these class members have lived with the belief that they would never have an opportunity to be released from prison. These facts

21

make Brooks and his fellow class members different from juvenile defendants sentenced at other times, and in our view, they reasonably justify different legislative treatment.

¶54 Accordingly, we conclude that the 2016 sentencing legislation classification is reasonable.

### III. Conclusion

¶55 For these reasons, we conclude that the 2016 sentencing legislation affects a genuine class and that the People have not met their burden of showing that the legislative classifications at issue are unreasonable. Accordingly, we hold that the 2016 sentencing legislation does not violate the Special Legislation Clause.

¶56 We therefore discharge the rule to show cause.

**CHIEF JUSTICE COATS** concurs in the judgment, and **JUSTICE MÁRQUEZ** joins in the concurrence.
**JUSTICE SAMOUR** does not participate.

CHIEF JUSTICE COATS, concurring in the judgment.

¶57    While I would also find that the amendment to the juvenile sentencing scheme at issue here does not offend the Special Legislation Clause of the state constitution, I am unconvinced by the majority's efforts to distinguish our rationale in People v. Canister, and therefore I do not join the majority opinion. Instead, I believe the situation presented by the case before us today amply demonstrates that our analysis of the constitutional bar to special legislation in Canister went awry and requires a course correction. Rather than perpetuate an unsustainable analytic framework, through what I for one consider implausible and unsupportable distinctions, I believe it is time to simply acknowledge that a class, however fortuitously small, imposed upon us by United States Supreme Court action is never "illusory," and curative legislation concerning that class cannot be a "special law" within the contemplation of our constitution.

¶58    Some thirteen years ago, in People v. Canister, 110 P.3d 380 (Colo. 2005), we struck down as special legislation an act of the General Assembly permitting a jury to be impaneled for the penalty phase of a capital case, where the defendant had already been convicted at the time capital sentencing by three-judge panels, like the procedure required by Colorado law, was barred by a Supreme Court opinion overturning long-settled law to the contrary. Because only two defendants, as fate would have it, fell within the class for which the curative legislation was required, rather than addressing the constitutionality of the statute in terms of the well-accepted ex post facto analyses of

1

both the state and federal constitutions, we found "the classification adopted by the legislature [to be] logically and factually limited to a 'class of one,' and thus [to be] illusory." Id. at 385. The prosecution asserts that the curative legislation at issue in this case is indistinguishable from that struck down by us in Canister, excepting only that Canister was a capital case and the statute in question potentially disadvantaged, rather than advantaged, the defendant, neither of which should be of consequence in a special legislation, as distinguished from an ex post facto, analysis.

¶59 Although the terms "special" and "general laws" are not further defined in the constitution, there can be little question but that the constitutional bar to special legislation, which was adopted in the late nineteenth century by the vast majority of states in the union, was inspired by, and aimed at curbing, legislative favoritism of the economic elite at the expense of the general welfare. See generally Justin R. Long, State Constitutional Prohibitions on Special Laws, 60 Clev. St. L. Rev. 719 (2012); Donald Marritz, Making Equality Matter (Again): The Prohibition Against Special Laws in the Pennsylvania Constitution, 3 Widener J. Pub. L. 161 (1993); Anthony Schutz, State Constitutional Restrictions on Special Legislation as Structural Restraints, 40 J. Legis. 39 (2013-14).

¶60 Because a law that expressly benefits only a named individual or entity is more easily identified as a private, or special, law, there is clearly an impetus, in evading the prohibition, for defining in general class terms any laws singling out such individuals or entities for special benefit, and we have in the past referred to the "classes" created

2

by such laws as "illusory" classes. See, e.g., In re Senate Bill No. 95, 361 P.2d 350 (Colo. 1961). But a class dictated by constitutional necessity, no matter how few its members, is clearly not illusory. Similarly, defining a "class" in such a way as to admit no additional members can sometimes be a technique for limiting the special benefit to a targeted individual, but the fact that a class is "closed" is hardly indicative that it is "illusory," or not "genuine." A class may be small or closed, or both, simply because the problem requiring legislative solution, especially if dictated by an intervening judicial determination of constitutional strictures, is unique to a class of that size and limitation.

¶61 For perhaps obvious reasons, the majority does not assert, as did the trial court, that the statute in question fails even to regulate practice in the courts of justice in this jurisdiction. Instead the majority labors, over the course of some twenty-five paragraphs, to distinguish the statute at issue in this case from the one we struck down as special legislation in Canister, on the grounds that the latter, but not the former, involved a "closed" class. I consider unconvincing, and in fact untenable, the majority's conclusion that the class defined and benefited by the relevant statute can yet be expanded.

¶62 The majority offers two scenarios in which it opines that the class of those benefited by the statute's new formula for sentencing juveniles convicted of felony murder could expand. As to the first, the majority suggests that despite being limited by its own terms to juveniles convicted of class 1 felonies committed between 1990 and

3

2006 <u>and</u> sentenced to life without parole, as mandated by the controlling statute at the time, the class of those entitled to the felony murder resentencing formula could include someone who was a juvenile at the time but is later convicted as an adult for committing such a felony during the designated period. The majority reasons either 1) that <u>although</u> the former sentencing provision has been found unconstitutional, and therefore no one can be lawfully sentenced to life without parole as required by it, such a "cold case" defendant would nevertheless still have to be sentenced under the unconstitutional statute and therefore fall within the statutorily defined class or 2) that <u>because</u> the former sentencing provision has now been found unconstitutional, the newly convicted defendant would have to be sentenced under the current felony murder formula and therefore come within the benefited class, despite not meeting the statutory definition of that class by having originally been sentenced to life without parole. In addition to being contrary to what we decided in <u>People v. Tate</u>, 2015 CO 42, 352 P.3d 959, concerning the penalty for a juvenile convicted of a class 1 felony committed during the period for which the controlling sentencing statute was unconstitutional, I find the majority's explanation not only hard to decipher but also unconvincing.

¶63 With regard to the second scenario, the majority opines that the class could be expanded by a successful post-conviction challenge to only a deliberation murder finding against a juvenile defendant who was sentenced to life without parole as required by the unconstitutional statute on the basis of jury findings of both

4

deliberation and felony murder. While this eventuality is certainly conceivable, it is hardly apparent why such an individual should be categorized as an addition to, rather than an already existing member of, the class. The statute clearly defines the class to include a juvenile convicted of felony murder committed during the applicable time period and sentenced to life without parole, whether or not a separate conviction for deliberation murder prevents him from realizing any actual benefit from the statutory reduction of felony murder by a juvenile to the status of lesser homicide offense. The elimination of other convictions in no way alters the statutory definition of the class in question, but if it could, and if we were to hold that the constitutionality of the statute turned on the possibility of expanding the class membership in this way rather than simply based on the curative nature of the legislation in question, we would, at least to my mind, be doing no one a favor.

¶64    In my view, we have come to use concepts like "closed" or "illusory" in ways that no longer serve the purpose for which they were developed, and our constitutional prohibition against special laws has come to be largely superseded by the subsequent development of modern equal protection law. At a minimum, it seems clear that curative legislation concerning a class dictated by Supreme Court action, rather than by a choice of the General Assembly at all, cannot be a special law within the contemplation of our constitution. Rather than saddle the General Assembly and lower courts of the jurisdiction with the kind of unpredictable and unworkable distinctions exemplified by the current litigation, and the concomitant burden of delay imposed

5

upon the intended beneficiaries of the legislation like that at issue here, I believe it is time to retreat from our rationale in <u>Canister</u>, whether its ultimate conclusion about the constitutionality of the legislation at issue there was or was not correct, and conclude that amendatory legislation required as a matter of constitutional necessity, regardless of the number of individuals or entities impacted by it, in no way implicates the so-called Special Legislation Clause of the Colorado Constitution.

¶65 Because I would therefore also discharge the rule, I concur in the judgment of the court.

I am authorized to state that JUSTICE MÁRQUEZ joins in this concurrence.